Brost Motors, Inc. v. Commissioner.
Brost Motors, Inc. v. Commissioner
Docket No. 15505.
United States Tax Court
1948 Tax Ct. Memo LEXIS 51; 7 T.C.M. (CCH) 806; T.C.M. (RIA) 48226; October 29, 1948
Daniel G. Yorkey, Esq., Marine Trust Bldg., Buffalo, N. Y., and Albert R. Mugel, Esq., for the petitioner. Clay Holmes, Esq., for the respondent. HARLAN Memorandum Findings of Fact and Opinion HARLAN, Judge: The Commissioner determined deficiencies of $423.54 in income tax and $31,287.50 in excess profits tax for the calendar year 1944. The issue is whether petitioner sustained a deductible loss in the amount of $38,160.44 from the sale of real property in 1944. The stipulation of facts filed by the parties is incorporated herein by reference as part of our findings of fact. Findings of Fact Petitioner is a New York corporation, incorporated in 1930, with principal place of business at Buffalo, New York. Income and excess profits tax returns for 1944 *52 were filed with the collector of internal revenue for the twenty-eighth district of New York on March 15, 1945. During 1944 and for many years prior thereto petitioner was engaged in the automobile business as an agency for Dodge and Plymouth cars, and it is still so engaged. Petitioner sells new and used automobiles and parts and performs service work and other work of the nature usually performed by automobile dealers and distributors. Frontier Discount Corporation is a New York corporation, incorporated in 1936, with principal place of business at Buffalo, New York. During the years 1936 to 1939, both inclusive, Frontier Discount Corporation acted as an automobile finance corporation for petitioner with regard to automobiles which petitioner sold under time payment plans. During the years 1940 to 1943, both inclusive, and during most of the year 1944, Frontier Discoint Corporation was inactive. During 1944 the authorized capital stock of petitioner consisted of 1,000 shares of the par value of $100 each. Of these 1,000 shares, 614 shares were issued and outstanding, of which 102 shares were held by Chester J. Brost, 385 shares were held by Mabel G. Brost, wife of Chester J. *53 Brost, and 127 were held by Grace K. Kirbis, sister of Chester J. Brost. During the year 1944 the officers of petitioner were as follows: President
Chester J. Brost
Vice-President
Mabel G. Brost
Secretary and Treas.
Joseph R. LaSpisa
During 1944 the authorized capital stock of Frontier Discount Corporation consisted of 1,000 shares of the par value of $100 each. Of these 1,000 shares 63 shares were issued and outstanding, of which 62 shares were held by Mabel G. Brost and 1 share was held by Chester J. Brost. During 1944 the officers of Frontier Discount Corporation were as follows: President
Chester J. Brost
Vice-President
Mabel G. Brost
Secretary and Treas.
Joseph R. LaSpisa
The business of petitioner is conducted in Buffalo, New York, in two buildings known as No. 1285 Main Street and No. 1291 Main Street. No. 1291 Main Street is leased to petitioner. It is owned by Bardol Co., Inc., a New York corporation, the stockholders of which have no interest in or affiliation with the petitioner and no relationship to petitioner's stockholders. It is used by petitioner for its general offices, as a new car sales room, and for passenger car service. *54 No. 1285 Main Street is used by petitioner, together with No. 1114 Ellicott Street, which adjoins it, for the sale of wholesale parts, for truck service and display, and for used car conditioning. Petitioner acquired the land at No. 1285 Main Street and No. 1114 Ellicott Street (hereinafter referred to as No. 1285 Main Street) in 1940 and in 1940 erected a building thereon. The cost to petitioner of this land and building was $137,814.74. Toward the end of 1944 the prospect for continued profitable operation of petitioner's business was not favorable. New cars were no longer manufactured and the new cars on hand were rationed. Toward the end of 1944 petitioner had exhausted its stock of new cars. Used cars were not readily marketable because of wartime restrictions on gasoline and tires. Petitioner's parts supply was drying up. Its labor situation was difficult. Though the property at 1285 Main Street was zoned for business only and not light manufacturing, in 1942 petitioner had been able, with some difficulty, to get a permit to operate a tool-making department for the duration of the war. But, after it had been operated in 1942 and 1943, the tool business proved no longer profitable *55 in mid-1944 and was liquidated. The Battle of the Bulge was on and petitioner did not know how long the war would last. It anticipated that business conditions would grow worse during the remainder of the war. There were several instances in Buffalo where an automobile agency had, in order to mitigate the risk of the automobile agency business, put its real estate into a separate corporation, so that if the agency business failed, the real estate would not be involved in the failure. On December 27, 1944, petitioner, by deed, transferred the land and the building at 1285 Main Street to Frontier Discount Corporation. Frontier Discount Corporation was authorized by its charter to buy real property. Because of the different stock interest in the two corporations petitioner had the property appraised by two real estate appraisers to insure that it would be transferred at its fair market value. The property was sold at the appraised valuation of $90,000. Frontier Discount Corporation borrowed the $90,000 it paid for the property from Chester J. Brost, who in turn had borrowed it from Manufacturers and Traders Trust Company. Frontier Discount Corporation gave Chester J. Brost a note *56 for $90,000 on which it has paid interest at the rate of three per cent per annum from December 27, 1944. The note is still outstanding. The money was borrowed by Brost because Frontier Discount Corporation was not able to obtain a loan. At this time Frontier Discount Corporation had no property other than office furniture and fixtures and some cash in the bank. On December 27, 1944, the aggregate amount of the depreciation allowed or allowable to petitioner upon the building at 1285 Main Street since its acquisition was $9,654.30, and the adjusted basis for gain or loss of petitioner in the land and building was $128,160.44. On December 27, 1944, and at all material times prior thereto the land and building at 1285 Main Street was real property used in the trade or business of petitioner, was not property includible in inventory of petitioner, and was not held for sales to customers of petitioner. In its income and declared value excess-profits tax return for 1944 petitioner reported a loss on the sale of the property in question of $38,160.44, being the difference between the adjusted basis for gain or loss on December 27, 1944, of $128,160.44 and the sale price of $90,000. Respondent *57 disallowed the loss and mailed notice of deficiency in income and excess profits tax for 1944 on May 16, 1947. The same appraisers who in 1944 appraised the fair market value of 1285 Main Street also appraised the fair gross rental value at $12,000 per year. After the transfer to Frontier Discount Corporation in 1944 that corporation leased the premises to petitioner at $12,000 per year. Deducting insurance, upkeep, annual depreciation of two per cent of cost of building, and $5,160 in property taxes, the net rental return was $4,500. At all times from 1940 to the present petitioner has occupied the property at 1285 Main Street. During that period there have been no assignments or subleases from Frontier Discount Corporation. All rentals were paid by petitioner to Front Discount Corporation. Petitioner and Frontier Discount Corporation occupy the same offices. They keep separate books. They have separate bank accounts in different banks. Separate directors' meetings are held and separate minute books are kept. When a second story and front were added to the building at 1285 Main Street in 1946, Frontier Discount Corporation made the changes, although it borrowed a part of the necessary *58 funds from Chester J. Brost and from petitioner, giving interest-bearing notes therefor. The building at 1285 Main Street in 1944 sat back 60 feet from Main Street and the property line, leaving a space for parking in front. The building itself was 90 feet front by 210 feet depth. It was a one-story building with a basement but was of heavy enough construction to support several additional stores. It was of steel and concrete, with a white brick front. The workmanship was good. There was a heating plant, good plumbing, and a sprinkler system throughout the building, in good condition. The main floor was 16 feet high, the basement 12 feet high, reached by a ramp. The roof of the building was a concrete construction, reached by a ramp. It was designed for storage of cars but was not so used because such storage had caused leaks in the roof. The basement was used for storage of automobile parts. The main floor was used largely for servicing cars. The main floor and the basement each contained about 19,000 square feet, totaling 38,000 square feet. The fair market value of the property at 1285 Main Street, Buffalo, New York, on December 27, 1944, was $90,000. Opinion Petitioner *59 claimed a deduction in its income and declared value excess profits tax return for 1944 of $38,160.44 for loss incurred upon the sale of real property, used in its trade or business, under section 117 (j) of the Internal Revenue Code. [1] Respondent disallowed the deduction. He bases the disallowance on the contention that the loss from the sale in issue was not a real loss, that the purported sale was between corporations controlled by the same interests, and that the sale was not at a price representing fair market value. Respondent and petitioner agree that section 24 (b) of the Internal Revenue Code has no application inasmuch as neither of the involved corporations was a personal holding corporation. *60 In support of his contention that the claimed loss was not a real loss and that the corporate entity of Frontier Discount Corporation should be disregarded in the transaction at issue, respondent relies generally upon language in the cases of Gregory v. Helvering (1935), 293 U.S. 465; Griffiths v. Helvering (1939) 308 U.S. 355; and Commissioner v. Court Holding Company (1945), 324 U.S. 331, to the effect that realities in tax matters should control and that the incidence of taxation depends upon the substance of a transaction. But specifically and principally he relies upon the decision of the Supreme Court in Higgins v. Smith (1940), 308 U.S. 473. In that case the Supreme Court refused to allow the taxpayer to deduct as a loss the difference between the cost of certain securities and their sales price to a corporation of which he owned all the stock. The Court viewed the Gregory case, supra, as "a precedent for the disregard of a transfer of assets without a business purpose but solely to reduce tax liability." It said, at page 358: "The Government may look at actualities and upon determination that the form employed for doing *61 business or carrying out the challenged tax event is unreal or a sham may sustain or disregard the effect of the fiction as best serves the purpose of the tax statute." Respondent urges that the decision in the Higgins case is applicable to the case at bar since, as he alleges, "the transfer of property to Frontier was not a bona fide transfer." We do not agree. We think there is sufficient evidence in the record to show that the transfer of the property in question had a business purpose and was not solely to reduce tax liability. Petitioner has amply shown that there was enough dislocation in the automobile dealer business during the war to warrant apprehension on its part. It was not at all unusual for automobile dealers in Buffalo to transfer real estate to a separate corporation to put it out of the reach of creditors in the event of a possible failure of the dealer agency. Similar transfers of real estate to a corporation for security reasons have been held to have a business purpose. Moline Properties, Inc. v. Commissioner, 319 U.S. 436, 63 S. Ct. 1132 (1943); Sheldon Building Corporation v. Commissioner (C.C.A. 7, 1941) 118 Fed. (2d) 835. Had the *62 transferor retained the beneficial ownership of the property, the transfer might be considered as without substance for tax purposes. Stewart Forshay, 20 B.T.A. 537. But such is not the case. Though Frontier Discount Corporation borrowed the purchase money from Chester J. Brost, it did so because it could not itself borrow from the bank. Frontier Discount Corporation gave Brost an interest-bearing note, upon which it has regularly paid interest, to evidence its obligation. Thus Chester J. Brost became a general creditor of Frontier Discount Corporation and the funds which it paid to petitioner on December 27, 1944, were its own funds. Clearly, Frontier Discount Corporation acquired full title and did not hold the property for the benefit of Chester J. Brost or of petitioner. Nor do we find any merit in the contention of respondent that the sale from petitioner to Frontier Discount Corporation should be regarded as without substance because the corporations were controlled by the same interests. Wilhelmina Dauth, 42 B.T.A. 1181; Shelden Land Company, 42 B.T.A. 498; General Securities Company, 38 B.T.A. 330. As was said in the General *63 Securities Company case, at page 333, "Such exceptional circumstances as justify disregard of corporate entities are limited and mere stock ownership or virtual identity of stockholders between buyer and seller does not justify it." We cannot, then, regard the transfer of the property in question to Frontier Discount Corporation as without a business purpose or lacking in bona fides. Similarly, we cannot regard Frontier Discount Corporation itself as unreal or a sham so as to justify disregarding its corporate entity. Here again the test is one of business purpose. As stated by the Supreme Court in Moline Properties, Inc. v. Commissioner, supra, at page 1134: "The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creditor's personal or undisclosed convenience, so long as that purpose is the equivalent of business activities or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity * * *." In the case at bar the record is quite clear that Frontier *64 Discount Corporation was organized in 1936 to handle automobile financing for petitioner. It carried on this activity until 1940, when it became inactive. In 1944, after the transfer to it of the property at 1285 Main Street, Frontier Discount Corporation leased this property to petitioner and thereafter collected rent under the lease. At all times Frontier Discount Corporation has kept separate books and records, maintained a separate bank account, and had separate directors' meetings and a minute book. It is plain that Frontier Discount Corporation was organized for a business purpose and that its organization was followed by the carrying on of business, even though it was inactive from 1940 to 1944 and its business activity after December 27, 1944, was limited to the leasing of property to petitioner. Respondent further attacks the sale from petitioner to Frontier Discount Corporation on December 27, 1944, of the property at 1285 Main Street as not being a sale at the then fair market value of the property. Petitioner supported the sale price of $90,000 with the testimony of two witnesses who testified as experts, both of whom were of the opinion that this sale price did represent *65 the fair market value of the property on the date of sale. Both witnesses had also, at the time of the sale in 1944, appraised the property at $90,000. The first witness, who had been in the real estate business for 50 years and had made appraisals for 40 years, determined a net rental figure for the property of $4,500 per year and capitalized this at the rate of 5 per cent to obtain a $90,000 valuation figure. The rental figure was reached by taking as the basis several neighborhood rentals and adjusting according to the construction, use, and location of the 1285 Main Street property. The witness considered but gave no weight to the original cost and reproduction cost less depreciation. He considered this latter figure excessive, because rental returns in buildings suitable for the automobile business were at that time in too depressed a condition because of the war for the property to earn enough to justify such a valuation. He also considered but gave no weight to assessed value, except to point out in his testimony that the property in question sold for 75 per cent of its assessed value, whereas the sales prices of 13 other comparable business properties at about the same time *66 in that area only averaged 54 per cent of their assessed value. The second witness, who had been in the real estate business for over a quarter of a century, also capitalized what he considered a fair rental value at between 5 per cent and 6 per cent to reach a valuation of $90,000. He arrived at a fair rental value figure by comparison with other rentals in the district. Respondent introduced no witnesses. On cross examination it was suggested that the possible use of the property in question for war purposes would have increased its value above the appraised value. However, the property was zoned for business only and not for light manufacturing, and petitioner was only able to get a permit to engage in the tool business for the duration of the war. Furthermore, the tool business had become unprofitable by the middle of 1944 and had been liquidated on that account. Finally, testimony of petitioner's experts showed that the rentals being paid for the use of this type of property for war purposes were generally lower than the rental values they gave this property in their appraisals. Upon consideration of all the evidence we have found that the fair market value of the property *67 at 1285 Main Street on December 27, 1944, was $90,000. Respondent erred in disallowing the deduction claimed. Decision will be entered under Rule 50. Footnotes
1. SEC. 117. CAPITAL GAINS AND LOSSES. * * *
(j) Gains and Losses From Involuntary Conversion and From the Sale or Exchange of Certain Property Used in the Trade or Business. - (1) Definition of property used in the trade or business. - For the purposes of this subsection the term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. * * * (2) General rule. - If, during the taxable year, the recognized gains upon sales or exchanges of property used in the trade or business * * * exceed the recognized losses from such sales, exchanges * * * such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. * * *↩