*Decision will be entered for the respondent.*

THE APEX CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3449–63. Filed September 30, 1964.

*Myron A. Halle, Jr.,* and *James W. Watson,* for the petitioner.
*William F. Franklin,* for the respondent.

TIETJENS, *Judge:* The Commissioner determined deficiencies in the petitioner's income tax as follows:

| Fiscal year ended March 31— | *Deficiencies* |
| --- | --- |
| 1960 | $4,728.86 |
| 1961 | 100,450.46 |
| 1962 | 32,925.14 |

The two questions presented are (1) whether the petitioner could make an apportionment of its cost basis of office and business equipment between leases of the equipment, which leases it sold, and the reversionary interests which it also separately sold, in computing the gains realized by it on these separate sales of leases and reversionary interests, and (2) whether the petitioner is entitled to use its entire basis and deduct ordinary losses on sales to Equipment, Inc., of the reversionary interests.

### FINDINGS OF FACT

The stipulated facts are found.

The petitioner is a Tennessee corporation with its principal place of business at Memphis, Tenn. It filed its Federal income tax returns for the fiscal years ended March 31, 1960, 1961, and 1962, with the district director of internal revenue at Nashville, Tenn. The petitioner, by change of name, is a successor to Apex Realty Co., whose principal business had been owning and leasing real estate.

During the taxable years in issue the petitioner was continuously engaged in the business of buying various kinds of office equipment and business machines (including medical and dental equipment), leasing them to third persons, selling all of its rental and lease rights therein to Murdock Acceptance Corp., hereinafter referred to as Acceptance, as soon as the lease agreement was executed, and thereafter selling its reversionary interest (that is, the particular equipment or machine, subject to the lease) to Equipment, Inc., hereinafter referred to as Equipment.

Acceptance is a publicly held Tennessee corporation which, during the years in issue, was engaged in a general finance business in Tennessee.

Equipment was chartered in 1960 for the purpose of acquiring from the petitioner the office equipment and business machines subject to the leases and selling the equipment on the open market after the expiration of the leases.

During all of the years in issue John E. Murdock, Sr. (hereinafter referred to as Murdock), was president of the petitioner, Acceptance, and Equipment.

Murdock, together with the General Insurance Agency of Tennessee, a wholly owned subsidiary of Acceptance, owned *in toto* the following percentages of the total outstanding shares of the petitioner as of the dates shown below:

| Mar. 31— | Percent |
|---|---|
| 1960 | 56. 38 |
| 1961 | 44. 13 |
| 1962 | 44. 33 |

Murdock, together with Model Service, Inc., a wholly owned subsidiary of Acceptance, owned *in toto* the following percentages of the total outstanding shares of Equipment as of the dates shown below:

| Mar. 31— | Percent |
|---|---|
| 1960 | 57. 56 |
| 1961 | 59. 02 |
| 1962 | 59. 02 |

No one stockholder owned directly or indirectly 50 percent or more of the stock of any of the corporations involved.

The circumstances and background for the above means of handling the various phases of the transactions here in question were that sometime prior to March 31, 1960, Acceptance wanted to undertake a business of acquiring and leasing out for profit various types of office machines and equipment. It found that it would not be able to enter directly into this type of business because of applicable restrictions contained in an indenture between Acceptance and an unrelated third party from whom it obtained long-term financing. It thereafter began to explore various means by which it could achieve an economic result similar to that which would flow from its engaging in the business of acquiring and leasing office machines and equipment without offending the provisions of the above indenture. One approach which was explored and which might have achieved this objective would have had the petitioner buy the equipment and enter into a lease with a third person and then sell the lease to Acceptance. This was not acceptable to the petitioner because it was concluded that the tax results would have been "unbearable."

Acceptance formulated a plan which it felt would achieve its objective. This plan, which was adopted, was to have the petitioner buy the equipment, lease it to a third party, transfer the rights accruing to the petitioner under the lease to Acceptance, and then transfer the

equipment or machinery subject to the leases to Equipment. Before the adopted plan could be implemented it was necessary to form Equipment. During the years in issue about 75 percent of the leases were for 3-year primary terms and 25 percent were for 5-year terms.

The petitioner kept no inventory on hand of the machines and equipment. The specific item of equipment was purchased for lease to a definite customer; the petitioner thereupon, and in its same taxable year, leased the equipment, sold the lease and rental rights to Acceptance, and then sold and transferred by bill of sale the reversionary interest in the equipment to Equipment.

The lease agreement between the petitioner and the lessee provided, *inter alia*, as follows:

11. Lessee is hereby granted the option to obtain a new one (1) year lease at an annual rental of $————. Said option may be exercised by Lessee by written notice to that effect to Lessor, which notice shall be accompanied by payment of the entire annual rental above described, and which shall be delivered to Lessor no less than ninety (90) days before the expiration of the term hereof. Said new one (1) year term and any succeeding one (1) year term, shall carry an identical option hereto, and except for the amount of rental, each new lease shall be subject to provisions and conditions identical with those of this lease. The rental payable for each new lease shall be that specified in this Paragraph 11 as payable for the first new lease. Notwithstanding anything provided in this Paragraph, in no event shall Lessee have the power or option to obtain more than ———————— successive new leases hereunder.

All lessees were selected by the petitioner with great care, and all lease and rental rights were transferred to Acceptance with a right of recourse against the petitioner in the event of default by the lessee. The bill of sale utilized in each instance when the petitioner transferred a particular piece of equipment or a machine, subject to a lease, to Equipment expressly reserved to the petitioner the right "to deal with such lease as it may deem proper, including but not limited to the right to collect for its own account the rental payments under said lease." The transfer of rental and lease rights from the petitioner to Acceptance was in no instance evidenced by a written contract or other document apart from the lease itself. The sale, however, had all the formalities requisite under applicable State law. The gross rentals payable under each lease executed by the petitioner exceeded the amount which Acceptance paid the petitioner for the rights, under the particular lease, transferred by the petitioner to Acceptance.

Equipment usually held the items of equipment which it purchased subject to the lease until the expiration of the lease. It then sold the particular equipment in the open market for the best price obtainable and received the entire proceeds of the sale. No option to purchase the equipment was given to any of the lessees. The petitioner had no agreement to repurchase any item it sold to Equipment.

The transactions in question were profitable for all of the three corporations involved.

The selling prices of the leases and rental rights to Acceptance and of the machinery subject to the lease to Equipment were at their respective fair market values.

There were six defaults out of 371 leases during the taxable years (1.6 percent). In each instance of a default by a lessee under a lease executed by the petitioner, the petitioner repurchased from Equipment the machine or equipment which had been subject to the lease, and paid Equipment an amount greater than that originally paid the petitioner for it by Equipment. Otherwise the petitioner has not dealt with the leases as its own.

In its Federal income tax returns for each year at issue herein, the petitioner reported as gross income the gross amounts received by it on sales of lease and rental rights to Acceptance, and deducted as ordinary losses the difference between its cost of the machines or equipment, and their selling price to Equipment.

In his notice of deficiency the Commissioner determined that—

The deduction[s] * * * claimed as a loss on the sale of equipment subject to leases in your Federal income tax return[s] * * * [are] not allowable under any provision of the Internal Revenue Code of 1954. Therefore, your taxable income * * * is increased in the amount[s claimed as deductions.] If it is finally determined that you sustained a loss on the transactions in question it is held, in the alternative, that the loss should be treated as a capital loss subject to the limitation in section 1211(a) of the Internal Revenue Code of 1954.

Consonant with this determination the Commissioner has allowed the petitioner a deduction for depreciation on the equipment.

## OPINION

The petitioner in its brief, as an alternative to the position taken in its return, first urges that it acquired the business equipment with the intention of creating the leases and the equipment subject to the leases (or the reversion) as two separate property interests. These two separate interests, it contends, should have allocated to them an equitable portion of the original basis; these to be reflected in the separate transactions of selling the leases and selling the reversions. Reliance is placed upon section 1.61-6(a), Income Tax Regs., which provides as follows:

Sec. 1.61-6 Gains derived from dealings in property.

(a) *In general.* * * * When a part of a larger property is sold, the cost or other basis of the entire property shall be equitably apportioned among the several parts * * *. The sale of each part is treated as a separate transaction and gain or loss shall be computed separately on each part. * * *

We do not think that these longstanding regulations are applicable here. The picture case of their purpose and applicability is the acqui-

sition of a tract of land followed by the sale of a portion of it. Allocation of basis is there indicated, but that is not the situation here.

On its income tax returns for the years in question the petitioner reported the gross selling prices of the leases on the business equipment and machines sold to Acceptance as ordinary gross income. It deducted as ordinary losses from sales to Equipment the difference between its full cost basis for the equipment and the selling price of the equipment, subject to the leases. The method of reporting the gross sales prices of the leases is not in question here. Only the deductibility of the losses is in issue.

The Commissioner's contention is that the petitioner, Equipment, and Acceptance had some interrelated stockholders and each had as president Murdock, who was able to exercise control over them; that Acceptance wanted to engage in the lease and sale of business equipment but was unable to do so because of restrictive indenture provisions; that there was a plan for the petitioner to acquire the equipment, simultaneously lease it to third parties, sell the leases to Acceptance, and the reversions to Equipment; that Equipment was organized because the tax result to petitioner of selling the leases to Acceptance with the resulting ordinary income, was "unbearable"; and that Equipment's purpose was to create losses for the petitioner.

The difficulty with the Commissioner's position is that the petitioner, Acceptance, and Equipment were all viable active corporations (see *Moline Properties, Inc.* v. *Commissioner*, 319 U.S. 436; *Columbian Rope Co.*, 42 T.C. 800) with differing stockholders and without an interrelated controlling interest in any one of them. And, as the Commissioner admits, each by its own operations made money. The petitioner received more than its cost of the equipment from its transfer of the leases to Acceptance and the reversions to Equipment; Acceptance in turn received more rental than the amount of money it paid for the leases; and Equipment, after the time lag made necessary by the terms for which the leases ran, sold the equipment coming into its possession for more than it had paid for the reversions. The price paid the petitioner for the reversions has been found to be at their fair market value. This conclusion is based on uncontroverted, unimpeached testimony by Murdock, who was president of all three of the corporations, with fiduciary responsibilities to each of these and their respective stockholders (none of whom held a controlling interest). All of them made profits, and were advantaged by the constant flow of business and the numbers and continuity of the transactions.

Moreover, if the present losses are not allowed the petitioner would be in the position of having to report its receipts from the sale of the leases as ordinary income, against which no portion of its basis

could be charged, and never recovering its basis in a transaction wherein it has completely disposed of its interest in the property. See *Wisconsin Electric Power Co.*, 18 T.C. 400, 403. This situation should be avoided if possible, and on the foregoing we think that it is possible here.

The Commissioner claims that the sales of the reversionary interests in the business machines by the petitioner to Equipment were shams in that, not being final and irrevocable, they did not give Equipment the benefits and burdens of the ownership of the machines. He urges that the sales lacked economic reality because of the alleged controlling relationships of the parties. (This we have already disposed of by concluding that no control existed sufficient to nullify the bona fides of the various transactions.) The Commissioner also contends that the economic reality of the transactions was absent because of certain terms in the bill of sale for each machine sold to Equipment. The bill of sale provided that:

Said sale and transfer are expressly subject to a certain lease dated _____ 19___, in which Apex Corporation is Lessor and _____ is Lessee. Apex Corporation expressly reserves the right to deal with such lease as it may deem proper, including but not limited to the right to collect for its own account the rental payments under said lease. The terms and conditions of said lease are incorporated herein by reference and made a part hereof. * * *

The "lease" to which reference is made is the petitioner's lease of the equipment to various third parties. The usual initial term was for 3 years. By the provisions of the lease the lessee is granted an option for successive 1-year renewals with a provision specifically limiting the number of such renewals.

Such a provision reasonably fixes the period of the lease which would be considered by the petitioner and Equipment in arriving at the price to be paid for the machines subject to the lease. The lessee, on making the lease contract, controlled the period of the lease and its renewals.

We see no basis for the Commissioner's contention that these provisions placed petitioner in control of the situation after the machines had been sold to Equipment. The sales were subject to the provisions of the leases but the full potential of these provisions was equally known to both parties. The rights which the petitioner had by the terms of the bills of sale and the executed leases encroach in no substantial manner upon Equipment's ownership of the machines, subject to the leases. Furthermore, in the actual operation over the years in question, whenever there was a default by the lessee, and there were only an insignificant number, the petitioner reacquired the machine subject to the lease by paying Equipment more than Equipment had

paid the petitioner when the machine subject to the lease was sold to it. This was undoubtedly to compensate Equipment for the unproductive lag period when its money was tied up in the reversion and the lease had not yet expired.

As to Acceptance, which had the lease and rental rights transferred to it by the petitioner by agreement between them, a default by a lessee was met in the not unusual manner of looking to the petitioner which had sold the leases to Acceptance.

We find no lack of substance in the dealings between the petitioner and Acceptance and the petitioner and Equipment. All three of the corporations had business activity and purpose; together they engaged in transactions from which they profited independently. The petitioner has reported as ordinary income its receipts from the sale of the lease rights; it is entitled to deduct the loss occasioned by the sale of the machines subject to the lease, as an ordinary loss.

The Commissioner has urged that the resolution of this controversy requires an overall look at the entire picture of Equipment, Acceptance, and petitioner. We agree with his approach but arrive at a different conclusion.

Reviewed by the Court.

*Decision will be entered for the petitioner.*

---

WITHEY, *J.*, dissenting: Having heard this case and listened to the testimony of the witnesses, I would have concluded, and do conclude, that the issue is fundamentally that considered by the Supreme Court in *Gregory* v. *Helvering*, 293 U.S. 465. To me the issue is whether even though Apex's losses arising from the sale of property to Equipment, literally fall within the definition of a deductible loss, they are nevertheless not deductible as not being covered or intended by Congress to be covered by sections 62(4) and 165(f), I.R.C. 1954, authorizing the deduction of losses. In my view Apex sold property to Equipment at a deliberate and planned loss, which sales were not at arm's length, did not represent sales at fair market value, and were deliberate creations of losses amounting, to the extent the sales price was less than fair market value, to virtual gifts from Apex to Equipment. Indeed, the mere fact that Equipment, years later at the expiration of the lease periods during which the property was being used and wasted, could sell the same consistently at a profit establishes the above facts to me. Equipment's only purpose for existence was as the recipient of such "gifts" and it and Apex's sales to it should be disregarded and considered to be shams. There is no statutory authorization for such deductions. The respondent should have prevailed in this case.