Transport Manufacturing & Equipment Company of Delaware v. Commissioner.
Transport Mfg. & Equipment Co. v. Commissioner
Docket No. 78372.
United States Tax Court
T.C. Memo 1968-190; 1968 Tax Ct. Memo LEXIS 108; 27 T.C.M. (CCH) 924; T.C.M. (RIA) 68190; August 29, 1968. Filed Guy A. Magruder, Jr., 1212 Fairfax Bldg., 101 W. 11th St., Kansas City, Mo., for the petitioner. Donald W. Geerhart, for the respondent. FORRESTER
Supplemental Memorandum Findings of Fact and Opinion FORRESTER, Judge: This case is before us on remand from the United States Court of Appeals for the Eighth Circuit for further fact finding and proceedings. See Transport Manufacturing & Equipment Co. of Del. v. Commissioner, 374 F. 2d 173 (C.A. 8, 1967), remanding in part [Dec. 26,881(M)] T.C. Memo. 1964-190. *109 The issue for consideration is whether petitioner suffered a deductible loss in 1956 when it sold certain trailers to Riss & Company, a corporation having substantially the same shareholders as petitioner. Though we did not consider this issue in our earlier opinion, the Eighth Circuit held that the issue of the bona fide nature of the transaction was properly before us. In remanding the case, the Circuit Court expressed the opinion that the pleadings in the case could have been improved and that leave to amend same should be granted to either party. It also ruled that under the peculiar circumstances of the case, either party should be permitted to offer additional evidence on the issue. Pursuant to the remand, we granted both parties leave to amend their pleadings if they so desired and held a second trial, during which both parties submitted evidence. Findings of Fact Some of the facts pertinent to the issue before us have been stipulated. Those stipulated facts are so found and included herein by this reference. Petitioner, Transport Manufacturing & Equipment Company of Delaware (hereinafter referred to as T.M. & E.), in 1956 had as its principal business the owning *110 and leasing of tractors, trailers and terminal facilities to Riss & Company (sometimes hereinafter referred to as Riss), a common carrier engaged in freight transportation. At all relevant times, substantially all the stock of both corporations was controlled by Richard R. Riss, Sr. (hereinafter referred to as Riss, Sr.), and his family. Riss, Sr., was chairman of the Board of Directors of both corporations, and he personally directed their affairs. There were no adverse economic interests between the two corporations as Riss, Sr., operated them as one unit. Actually, T.M. & E. was organized only as a business convenience to Riss & Company and as a means of enabling Riss & Company to meet certain requirements of the Interstate Commerce Commission at a minimum of cost and inconvenience. [1] 925 The trailers in issue were originally purchased new by T.M. & E.'s predecessor corporation from Fruehauf Trailer Company in 1952. The trailers were purchased in five lots of 30 trailers each, totaling 150 trailers as follows: Date of Purchase
No. of Units
Serial Nos.
March 6, 1952
30
AV-168008-AV-168037
March 7, 1952
30
AV-168038-AV-168067
March 14, 1952
30
AV-168068-AV-168097
March 28, 1952
30
AV-168098-AV-168127
April 4, 1952
30
AV-168128-AV-168157
*111 All of the trailers were model FD-120-S-SP city delivery vans of 18 or 20-foot length, and were acquired at an aggregate cost of $342,000. When T.M. & E. bought equipment, it was primarily liable for the purchase price, but Riss was obligated for the purchase price on default by T.M. & E. T.M. & E. usually made a nominal, or no, down payment, giving the seller a chattel mortgage for the balance of the purchase price. Simultaneously, it leased the equipment to Riss for a term coextensive with the mortgage and assigned the lease to the seller as security on the mortgage. On each of the five dates of purchase in the instant case, T.M. & E.'s predecessor corporation entered into a long-term lease of the 30 trailers with Riss. The first two leases provided for rental charges of not less than $1,207.20 for fifty-seven months. The last three provided for rental charges of not less than $1,186.38 for fifty-eight months. The actual rent due was fixed by Riss, Sr., as $120 per trailer per month, a rate which was somewhat lower than the going rate. The total yearly rent paid pursuant to the leases was as follows: 1952
$159,810$61953
219,000
1954
219,000
1955
219,000
1956
109,200
*112 It was the intention of the parties that T.M. & E. should not realize any substantial profit on the rental of the equipment to Riss & Company. While the rentals charged Riss & Company were for the use of the trailers, the amount of the rent was intended only to compensate T.M. & E. for the cost of the equipment plus financing charges and a nominal amount to cover bookkeeping costs. The leases provided that the payments were to cover the cost of maintaining the trailers; however, they were either modified or construed to provide that the lessee (Riss & Company) had complete responsibility for repair and maintenance of the leased trailers, and such practice was followed. When the leases terminated the trailers were to be returned to T.M. & E. On July 1, 1956, T.M. & E. sold the 150 Fruehauf trailers to Riss & Company for an aggregate price of $34,500. At the time the sale was transacted, Riss & Company was desperately in need of working capital, having incurred net operating losses of (rounded) $3.5 million in 1954, $3 million in 1955, and $1.7 million in 1956. Not all of the trailers were in use at that time and the $18,000 per month in rent which Riss was paying to T.M. & E. was *113 one expense which was draining Riss & Company of cash. Riss, Sr.'s main concern was keeping Riss & Company solvent, and this interest iverrode any others. As he stated at the supplementary hearing in this matter: The main thing I was concerned about was getting Riss and Company out of the loss bracket. I had to do anything regardless of who I affected, T.M. & E. or John Smith. I was trying to get any expenses I could out of Riss and Company so they could get back to breaking even. Consequently, even though the long-term leases on the trailers had approximately six months to run, requiring rental payments to T.M. & E. from Riss & Company of approximately $110,000. T.M. & E. sold the trailers to Riss & Company for an aggregate cost of $34,500, thus canceling the lease agreement. The $34,500 figure was on which Riss, Sr., under the circumstances, thought was a fair price, though he did not attempt to solicit bids from disinterested parties. He also felt that the rentals had been too high during the latter portions of the leases, and took this factor into consideration when he set the sales price. At the time of sale, the trailers in general were becoming obsolete due to a trend *114 toward longer equipment and better workmanship in new model trailers. In addition, the trailers were not all in good condition. As many as 50 percent of the trailers had been unused for lengthy periods of time due to a drop in Riss & Company's business, and during that time some of them had been "cannibalized," i.e., parts of the trailers had been removed by Riss personnel for use on other equipment or had been stolen. The parts removed included tires, landing gears, brake shoes, hubs and drums, relay valves, change gates and axle springs. A badly cannibalized trailer was worth only about $150 on the open market. 926 A number of the trailers which were in fairly good condition were continued to be used in Riss' operation after the sale. After Riss spent some undisclosed amounts in fixing them up, 30 of the trailers were sold to Fruehauf Trailer Company on May 24, 1957, approximately one year after their sale by T.M. & E., for $1,000 each. The Riss & Company journal entry dated May 24, 1957, recording the sale, contains the following explanation: Amount due from Fruehauf transferred to T.M. & E. for application by them [sic] to amount due Fruehauf from T.M. & E. [Emphasis *115 supplied.] The sale to Fruehauf was solely for the purpose of extinguishing T.M. & E.'s liability to Fruehauf. On July 24, 1957, Riss sold 20 of the trailers to Carlisle Sales Corporation, an unrelated third party, for $1,200 each. These units were also repaired by Riss & Company at an undisclosed cost for purposes of such sale. The sale to Carlisle was tied in with a sale of a terminal which T.M. & E. owned and Carlisle was not really interested in purchasing the trailers. As Riss, Sr; testified: I practically insisted on him buying these 20 trailers, because they were in the yard, and it would cost a considerable amount of money to move them. I insisted on him, selling him the terminal. I said, "Look, I have these trailers here, what am I going to do with them." He needed some trailers, and he bought them. In 1961, more than 4 1/2 years after the sale from T.M. & E., 64 of the trailers were seized by Fruehauf Trailer Company in partial satisfaction of Fruehauf's claim then being litigated against Riss & Company. It was not until December 31, 1963, that 26 of the trailers were finally written off by Riss & Company as unusable. The ultimate disposition of the remaining 10 *116 trailers is not in the record. Though the market for used trailers improved between 1954 and 1961, there were no sudden market changes which would have caused used trailers to substantially appreciate in terms of their market value or their anticipated life. When T.M. & E. owned the trailers, it depreciated them on a three-year basis on its books and on its income tax returns. Consequently, when the trailers were sold to Riss & Company in 1956, they had a book value of zero and the $34,500 received was treated on its books and records and its income tax return for 1956 as a longterm capital gain of $34,500. After the original trial of the instant case, the parties stipulated that the trailers should have been depreciated over a six-year life, with an assumed salvage value of 20 percent. This stipulation was adopted by us in our decision. As a result of our finding, T.M. & E's allowable depreciation write off for the years 1952 through 1956 was reduced. Concomitantly its adjusted basis in the trailers at the time of the sale to Riss & Company was increased from zero to $146,680 [2] and the receipt of $34,500 when subtracted from this basis resulted in a book loss of $112,180. *117 [2]
In the Rule 50 computation submitted to and approved by us, respondent did not credit petitioner with a loss on the sale of the trailers, though he did reduce T.M. & E's taxable long-term capital gain by the $34,500 amount reported. On appeal the Eighth Circuit found that the bona fide nature of the sale to Riss & Company was properly before us, and in absence of a specific finding on this point in our opinion, remanded the case to us for fact findings on the issue of whether the $112,180 book loss was deductible by T.M. & E. for income tax purposes in 1956. Ultimate Findings of Fact The sale of 150 trailers from T.M. & E. to Riss & Company had no business purpose pose insofar as T.M. & E. was concerned. The difference between the $34,500 amount received and the $146,680 basis of the trailers was a contribution to capital by the shareholders of T.M. & E. to Riss & Company. Opinion On July 1, 1956, substantially all of the stock in petitioner, *118 T.M. & E. Corporation and Riss & Company was held by Richard Riss, Sr., and his family. On that date T.M. & E. Corporation sold 150 Fruehauf trailers to Riss & Company for $34,500. At the time of the sale the basis of the trailers in the hands of T.M. & E. was $146,680, consequently, T.M. & E. suffered a book loss of $112,180 on the transaction. The question for 927 decision is whether all or any part of the said $112,180 is to be recognized as a loss for income tax purposes. There is no dispute as to the fact that both corporations were separate economic entities at the time of the sale or that the sale in question actually took place between them. What is unsettled is whether or not the corporations were both acting in their economic self-interest at the time of the transaction, in addition to acting in the overall self-interest of Richard Riss, Sr., and his family. At the threshold, we point out that we agree with the parties that section 267 of the Internal Revenue Code, [3] relating to deductions disallowed in transactions between related taxpayers, does not apply to the instant case. But as we pointed out in Jesse Johnson, 24 T.C. 107 (1955), *119 affd. 233 F. 2d 752 (C.A. 4, 1956), certiorari denied 352 U.S. 841 (1956), in regard to section 24(b)(1) of the 1939 Code, the predecessor of 267 (pp. 114-115): that section is not exclusive in the disallowance of losses between related taxpayers. If "good faith and finality" are lacking in a transaction between related taxpayers, purported losses must be disallowed even though not specifically covered by section 24(b)(1). Crown Cork International Corporation, 4 T.C. 19 (1944), affd. 149 F. 2d 968 (C.A. 3, 1945). In Johnson, supra, we also pointed out that not all losses incurred by corporations in dealings with other corporations under common ownership are nondeductible because of the "difficulty or impossibility of maintaining an arm's-length relationship." Johnson, supra (p. 115): Where, as in the instant case, the record clearly shows that a taxpayer did not maintain an arm's -length relationship in his dealings *120 with his wholly owned corporation, his purported losses must be disallowed. Also cf. Apex Corp., 42 T.C. 1122 (1964). In this regard, the approach used by the Court of Claims in similar situations is appropriate. As that court stated in Long Corporation v. United States, 298 F. 2d 450 (Ct. Cl. 1962), at 453: In determining whether or not the form used was one of substance, and not a sham, this court has closely scrutinized those transactions in which a common ownership factor was present. Our approach has been to ascertain whether the transaction was "one that could have reasonably been made between parties dealing at arm's length," and if it were, a business loss would be deductible. George E. Warren Corp. v. United States USTC 9641A], 141 F. Supp. 935, 135 Ct. Cl. 305, 312 (1956). Cf. Wilhelmina Dauth, 42 B.T.A. 1181, 1188 (1940). In the instant case, we find and hold that reasonable parties dealing at arm's length would not have entered into the transaction in issue. We have no doubt that the transaction was one which Riss & Company would have entered into at any time, in view of the fact that for a payment of *121 $34,500, Riss & Company escaped rental charges of $110,000, and received title to trailers which had a substantial value. However, to hold for petitioner we must find that T.M. & E.'s sale of the trailers for $34,500 was in line with sound business practices, and the preponderance of evidence presented shows that it definitely was not. At the time T.M. & E. sold the trailers, there was approximately six months left to run on leases which guaranteed the corporation approximately $110,000 in rents, which amounts were calculated to meet T.M. & E.'s mortgage payments on the trailers. Upon disposition of the trailers for $34,500, more than $75,500 in potential income was abandoned. This fact alone places grave questions in our mind as to the reasonableness of the sale. In addition the trailers themselves seemed to be worth more than $34,500. Though all the trailers were not in the same condition, 30 were sold to Fruehauf Trailer Company for $1,000 apiece, and 20 were sold to Carlisle Sales Corporation for $1,200 apiece during the 13 months following the sale. Both Fruehauf and Carlisle were unrelated to T.M. & E. We believed Riss, Sr., and Kenneth Gibson (a shop foreman at Riss & *122 Company in 1954) when they testified that there were some fixing up costs incurred by Riss & Company in order to get the trailers in a salable condition. Yet, neither man was inclined to offer an estimate as to the amount incurred and petitioner introduced no records as to such fixing up costs. Petitioner does contend that the amounts received by Riss & Company for the trailers 928 from Fruehauf and Carlisle were not solely for the trailers. As regards the Fruehauf sale, Riss, Sr., testified he "practically insisted" that Fruehauf take the trailers because Riss & Company had too many trailers. Supposedly the sales price received was actually a trade-in price on trailers to be purchased in the future, which included discount on future purchases of trailers in addition to the price Riss & Company received from the trailers sold. As regards the Carlisle sale, Riss, Sr., testified that he similarly "practically insisted" that Carlisle buy the trailers along with the terminal in which they were stored, and because Carlisle needed trailers the sale was consummated. Insofar as the sale to Fruehauf is concerned, we do not believe the trade-in story. If there were a trade-in on trailers, *123 we find it strange that Fruehauf and Riss, Sr., did not agree on specific trailers rather than a trade-in price for trailers in general. We do not belabor this point here, however, because the evidence in the record shows that the sale to Fruehauf was to be applied to T.M. & E.'s indebtedness to Fruehauf. The journal entry explaining the transaction, reproduced in the findings of facts, states that such was the purpose, and we have so found. As for Riss, Sr.'s insisting that Fruehauf and Carlisle buy the trailers, we fail to see how that fact shows that the trailers were sold for a price in excess of their fair market value. It would seem that under such circumstances, Riss & Company would actually receive a lower price than the going rate for such trailers. Assuming that the usable trailers were worth about $1,000 each (prior to fixing up costs), the "cannibalized" trailers $150 each (as testified to by Clark), and that there were equal numbers of each (also as testified to by Clark), [4] the fair market value of the trailers at the time they were sold by T.M. & E. would be approximately $86,250. This amount, added to the $110,000 [5] rentals due for the use of the trailers, shows *124 a value of the trailers to T.M. & E. of as much as (rounded) $196,000, an amount far in excess of T.M. & E.'s basis in the trailers. We do not decide what the exact value of the trailers was at the time of their sale in 1956, as that is not necessary to our decision. We do find and hold that the sales price was grossly inadequate for the sale to be considered as entered into on an arm's-length basis. Riss, Sr., did testify that the sales price was possibly reduced because of past excessive rentals paid by Riss & Company in view of the deteriorated condition of some of the trailers. We fail to see how this helps him. We doubt if that is a consideration which parties, at true arm's length, would consider. In addition we fail to see how the rent was excessive *125 when it was intended to and could only bring a minimum profit to the lessor. Respondent would have us find that the sale to Riss & Company was entered into solely for income tax purposes and thus to be disregarded for tax purposes under our holding in Crown Cork International Corporation, 4 T.C. 19 (1944). We decline to make such a sweeping finding under the circumstances of this case, but do hold that the transaction lacked economic substance as a sale. We have no quarrel with Riss, Sr.'s desire to favor Riss & Company over T.M. & E., and in no way condemn him for structuring the transaction as he did. But, insofar as the transaction in issue lacked the requisite business purpose required for T.M. & E. to recognize a loss, we hold that the difference between T.M. & E.'s basis in the trailers and the $34,500 received from Riss & Company represents a capital contribution to Riss & Company by the shareholders of T.M. & E. Higgins v. Smith, 308 U.S. 473 (1940); Jesse Johnson, supra; V & M Homes, Inc., 28 T.C. 1121 (1957), affirmed per curiam 263 F. 2d 837 (C.A. 6, 1959); A. Arena & Co. v. United States, 103 F.Supp. 505 *126 (D.Cal., 1952). Our holding makes it unnecessary for us to reconsider respondent's objection to our placing the burden of proof upon him at the supplementary trial in the instant case. Decision will be entered for the respondent. 929 Footnotes
1. Other facts relating to the nature of the operation of each corporation are set forth in our opinion of July 14, 1964 (T.C. Memo. 1964-190↩).
2. The parties are now agreed upon these figures. In Transport Manufacturing & Equipment Co. of Del. [67-1 USTC 9293], 374 F. 2d 173↩, they are shown as (p. 175) $177,198.75 and $142,698.75, respectively.
3. All references, unless otherwise noted, are to the Internal Revenue Code of 1954.↩
4. We may be over generous in assuming that one-half the trailers were unusable, as the evidence shows that only 26 trailers were ever written off as unusable, that 50 trailers were sold as described above, and 64 trailers were worth the cost of seizure and resale more than four years after the sale in issue. ↩
5. Because this figure is an approximate one, due in a relatively short time, we do not discount it for this example.↩