CROWN CORK INTERNATIONAL CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 1004.   Promulgated September 21, 1944.

*J. Marvin Haynes, Esq.*, and *William T. Sherwood, Jr., Esq.*, for the petitioner.

*Jonas M. Smith, Esq.*, for the respondent.

OPINION.

Opper, *Judge*: The question whether a corporation may be permitted to deduct a loss sustained on a sale to its wholly owned subsidiary is dealt with to a limited degree by section 24 (b). (1), Internal Revenue Code.[1]

Since, however, the provisions of that section are confined to personal holding company transactions and since it is stipulated here that neither of the corporations was a personal holding company, it becomes apparent that the statutory provisions do not operate by their own force to disallow the loss. The question, then, narrows to whether these provisions were intended to be exclusive so that the failure of Congress to provide specifically that the transaction must be disregarded requires the contrary result—that it be given effect for tax purposes.

While there is little on the face of the legislation which can aid in ascertaining the answer, the committee reports accompanying the original (1937) provision explain the legislative intent. It is there stated (Ways and Means Committee, 75th Cong., 1st sess., H. Rept. 1546, p. 26, 1939–1 C. B., part 2, pp. 722, 723) that: "This provision of existing law is not exclusive," and that "as in the case of the provisions of existing law, it is not intended by this amendment to imply any legislative sanction of claiming deductions for losses on sales or exchanges in cases not covered thereby, where the transaction lacks the elements of good faith or finality, generally characterizing sales and exchanges of property." While this reference tends to eliminate any uncertainty as to the exclusive nature of the statutory provision, it has the further effect of raising an additional question. We must determine whether the elements of "good faith and finality" are present before we can dispose of a controversy of this sort; and in that operation the sense in which these words were used constitutes a necessarily connected inquiry.

The case of *Higgins* v. *Smith*, 308 U. S. 473, was decided subsequent to the enactment of the 1937 Act, so that its doctrine was unavailable to the legislators, but, on the other hand, it dealt with an earlier year,

---

[1] SEC. 24. ITEMS NOT DEDUCTIBLE.

\* \* \* \* \* \* \*

(b) Losses from Sales or Exchanges of Property.—

(1) Losses Disallowed.—In computing net income no deduction shall in any case be allowed in respect of losses from sales or exchanges of property, directly or indirectly—

\* \* \* \* \* \* \*

(B) Except in the case of distributions in liquidation, between an individual and a corporation more than 50 per centum in value of the outstanding stock of which is owned, directly or indirectly, by or for such individual;

(C) Except in the case of distributions in liquidation, between two corporations more than 50 per centum in value of the outstanding stock of each of which is owned, directly or indirectly, by or for the same individual, if either one of such corporations, with respect to the taxable year of the corporation preceding the date of the sale or exchange was, under the law applicable to such taxable year, a personal holding company or a foreign personal holding company.

so that the 1937 amendment was not directly involved. It consequently exerts no conclusive authority upon the present question. Nevertheless, numerous expressions in that opinion seem to us to have a bearing on it. It is stated, for example, that:

\* \* \* Indeed this domination and control is so obvious in a wholly owned corporation as to require a peremptory instruction that no loss in the statutory sense could occur upon a sale by a taxpayer to such an entity.

At another point the Court observed:

\* \* \* The Government may look at actualities and upon determination that the form employed for doing business *or carrying out the challenged tax event is unreal or a sham* may sustain or disregard the effect of the fiction as best serves the purposes of the tax statute. \* \* \* [Emphasis added.]

And that:

\* \* \* Title, we shall assume, passed to Innisfail [taxpayer's wholly-owned corporation] but the taxpayer retained the control. Through the corporate forms he might manipulate as he chose the exercise of shareholder's rights in the various corporations, issuers of the securities, and command the disposition of the securities themselves. There is not enough of substance in such a sale finally to determine a loss.

Finally we note the following:

The Government urges that the principle underlying *Gregory* v. *Helvering* [293 U. S. 465] finds expression in the rule calling for a realistic approach to tax situations. As so broad and unchallenged a principle furnishes only a general direction, it is of little value in the solution of tax problems. If, on the other hand, the Gregory case is viewed as a precedent for *the disregard of a transfer of assets without a business purpose but solely to reduce tax liability,* it gives support to the natural conclusion that transactions, which do not vary control or change the flow of economic benefits, are to be dismissed from consideration. There is no illustion about the payment of a tax exaction. Each tax, according to a legislative plan, raises funds to carry on government. The purpose here is to tax earnings and profits less expenses and losses. If one or the other factor in any calculation is unreal, it distorts the liability of the particular taxpayer to the detriment or advantage of the entire taxpaying group. [Emphasis added.]

The effect of the *Smith* case is thus summed up in *Moline Properties, Inc.* v. *Commissioner*, 319 U. S. 436:

\* \* \* In general, in matters relating to the revenue, the corporate form may be disregarded where it is a sham or unreal. In such situations the form is a bald and mischievous fiction. *Higgins* v. *Smith*, 308 U. S. 473, 477–478; *Gregory* v. *Helvering*, 293 U. S. 465.

Applying these expressions against the background of the Ways and Means Committee's language, there emerges a fairly practical rule for application in such situations as the present. Not all transactions between a wholly owned corporation and its parent are to be disregarded. But where either the relationship between the two is such that they are in fact inseparable, so that the individual existence of the two entities is an unsupported fiction and the "finality" of the loss to the combined enterprise is consequently negatived, cf. *Interstate Transit Lines* v.

*Commissioner*, 319 U. S. 590, or the transaction itself is without a true purpose except that of tax avoidance, so that its effectiveness to "change the flow of economic benefits," its "good faith," as an incident of the conduct of a business, is suspect, cf. *Wickwire* v. *United States* (C. C. A., 6th Cir.), 116 Fed. (2d) 679, then taxpayers have failed to show themselves entitled to the benefit of the loss.

This view finds support in the language of *Commissioner* v. *Laughton* (C. C. A., 9th Cir.), 113 Fed. (2d) 103. That opinion analyzes the *Smith* case at some length, since it was considered as "controlling this proceeding." Dealing with the reference in the *Smith* case to a peremptory instruction denying the possibility of a loss in the case of a wholly owned corporation, the court says:

That the phrase "wholly owned" in this dictum regarding instruction to the jury means something more than mere stock ownership is to be inferred from a ruling at the end of the opinion.  *  *  *

\*     \*     \*     \*     \*     \*     \*

It is arguable that the *Higgins* decision means that no matter what the particular "tax event" may be, if it be more profitable to the tax collector to disregard the intervening corporate entity this must be done. However, it seems to us that if this were the intent of the court it would have said so and not spread its consideration of the cases over many pages of the opinion with such qualifying language as is quoted above.

We take the opinion to mean that the "tax event" is not an unreal attempt to use a corporation for a sham transaction, procuring an advantageous tax consequence to the taxpayer, if it may be considered as one primarily for an independent business purpose and not a transfer of assets  *  *  *  with a retention of their control, solely to reduce tax liability.

Applying this criterion to the instant case the question here is not whether Industries, Ltd., was formed for a business purpose. The corporation in *Higgins* v. *Smith*, supra, was formed and used for profitable business purposes causing it to pay federal and state income taxes.  *  *  *

\*     \*     \*     \*     \*     \*     \*

There is evidence here from which it might be inferred that tax avoidance by a sham transfer by Laughton of his services was the primary purpose of the use of the corporation. There is also evidence from which it may be inferred that it was not.  *  *  *  [Among other things] Laughton had no intention to avoid taxes;  *  *  *  the purpose of engaging himself for five years as an employee of Industries, Ltd., was to join his efforts with other employees of the company to create motion pictures;  *  *  *

\*  *  *  the directors of his company were not dominated and controlled by him as in the case of *Higgins* v. *Smith*, supra, that, on the contrary, they were business men who ran the business with a free hand  *  *  *.

Because the Board's decision there under review had antedated *Higgins* v. *Smith* and there were no ultimate findings on the issue as framed by the appellate court, the case was remanded for further proceedings. See also *Inland Development Co.* v. *Commissioner* (C. C. A., 10th Cir.), 120 Fed. (2d) 986; *Kaspare Cohn Co., Ltd.*, 35 B. T. A. 646; *National Investors Corporation* v. *Hoey* (C. C. A., 2d Cir.), 144 Fed. (2d) 466.

Reverting to the present controversy, the stipulated facts fail to disclose any information from which it is possible to arrive at an independent conclusion as to the relationship between petitioner and its subsidiary, and particularly from which we may draw the material for an ultimate finding as to the separation of the two businesses or the extent of domination and control exercised by petitioner as the sole owner of its affiliate's stock. The personnel of the respective boards of directors is not disclosed. For all that appears, it may have been identical. There is no showing whether or not the subsidiary had officers of its own, as distinguished from those of the parent, whether its business was conducted by a separate organization, whether, even in theory, it was capable of reaching independent decisions, or how its properties and finances were carried and operated. We do know that the stated purpose of the organization of the two corporations was sufficiently similar so that a combined conduct of their joint business would not be unreasonable. The subsidiary was organized "for the purpose of acquiring investments in and financing crown cork and cork manufacturing and selling companies," while the purpose of petitioner was "to acquire securities of companies engaged in the manufacture and sale of crown corks, cork and related products." We know also that the subsidiary agreed to a price heavily weighted in favor of the parent. At any rate, it is clear that the burden of proving any facts favorable to it in this respect has not been borne by petitioner and, consequently, the record would warrant only a finding that the subsidiary is under the complete domination and control of petitioner, and that there is in substance no distinction between the two. *Southern Pacific Co.* v. *Lowe*, 247 U. S. 330; *North Jersey Title Ins. Co.* v. *Commissioner* (C. C. A., 3d Cir.), 84 Fed. (2d) 898. It would follow that a transfer from one to the other was no more than a shifting from one department or branch to another of the same entity, and hence that the loss is utterly lacking in finality. On that ground alone, its disallowance would be required.

More than this, however, we are faced with a lack of any business purpose for the transaction necessary to justify the recognition of loss resulting from it. No more is shown in this connection than excerpts from the minutes of the meetings of the board of directors of the two corporations. It may perhaps be inferred from the subsidiary's proceedings that the acquisition of the shares in question was desirable because it already held stock in companies conducting a related business. This is the sole consideration urged by petitioner in its brief. But why it should for this reason be concerned to secure the property for itself when it already rested in the complete control of its parent, and particularly why it should desire this consequence so fervently as to be prepared to accomplish it at a cost of two and a half times the market value of the stock, is not even suggested.

Even, however, if the reason for the subsidiary's action were more convincing, petitioner would yet appear to be thrust into an irreconcilable dilemma. Its sale to the wholly owned subsidiary can be given effect only on the assumption that there exists in fact a measure of independence between the two commonly owned corporate entities. But, if so, the intention and purposes of the one may not successfully be attributed to the other. It would only be the assumption that the subsidiary could reach and effectuate a decision independent of and unrelated to that of the parent which would warrant the conclusion that their separate existence justifies recognition of intercorporate transactions.

But by that token any ground which the subsidiary may independently have expressed to explain its participation would furnish no validity to assumptions regarding the reciprocal participation of the parent. With this eliminated, there is absent from the record any suggestion of a possible business purpose on the part of petitioner, the parent, for the transfer of·these securities.[2] The only motive shown is that described by the stipulation—"to secure a tax saving." That is not sufficient to avoid the impact of the *Gregory* case "as a precedent for the disregard of a transfer of assets without a business purpose but solely to reduce tax liability." *Higgins* v. *Smith, supra.*

It seems to us to follow that no loss was sustained by petitioner upon the transaction in controversy which is cognizable as matter of tax liability; and that this is so not solely because petitioner's wholly owned subsidiary was the other participant, but rather by reason of the domination and control exercised over the actions of the subsidiary, and because on this record the principal and indeed the only motive for the transfer from parent to wholly owned affiliate was that of avoiding taxes, with no true business purpose shown or even suggested. In those circumstances the transaction must, for tax purposes, be characterized as sham, unreal, and lacking in good faith and finality, and, consequently, as one which it was not the intention of the lawmakers to include among deductible losses. *Gregory* v. *Helvering*, 293 U. S. 465. Respondent's determination is sustained.

Reviewed by the Court.

*Decision will be entered for the respondent.*

ARNOLD and KERN, *JJ.*, concur only in the result.
ARUNDELL, BLACK, and MELLOTT, *JJ.*, dissent.

---

[2] Such light as is cast by the minutes of the meeting of petitioner's directors illuminates only its aim prior to the outbreak of the war to dispose of the shares, at an undisclosed price, presumably to outside interests. But the failure of this project is emphasized and the advent of war could certainly not enhance its prospects. Since the war had by then set in, we are no more informed of the contemporaneous motives of petitioner's officers than the entirely ambiguous statement that "it was deemed advisable to sell." We can only speculate why it was "advisable."