JOSEPH E. WIDENER, TRUST No. 5, PROVIDENT NATIONAL BANK, TRUSTEE No. 56712, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

PETER A. B. WIDENER, TRUST No. 5, PROVIDENT NATIONAL BANK, TRUSTEE No. 65972, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2689–78, 2690–78.　　Filed January 31, 1983.

*Thomas F. Cunnane* and *Thomas M. James*, for the petitioners.

*John W. Schmehl*, for the respondent.

FORRESTER, *Judge*: Respondent determined deficiencies in petitioners' Federal income tax for their fiscal years ending January 31, 1975, as follows:

| Docket No. | Deficiency |
|---|---|
| 2689–78 | $19,704 |
| 2690–78 | 13,964 |

The question presented is whether petitioner trusts may recognize capital losses generated by various stock sales between themselves.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioners Peter A. B. Widener Trust No. 5 (hereinafter PW Trust) and Joseph E. Widener Trust No. 5 (hereinafter JW Trust) timely filed their Federal income tax returns for their respective years ended January 31, 1975. The Provident National Bank of Philadelphia, Pa. (hereinafter Provident, or Provident Bank), and William P. Wood, of Philadelphia, Pa., were the trustees of the PW Trust at the time the petition in docket No. 2690–78 was filed; Provident Bank and H. Peter Somers, of Philadelphia, Pa., were the trustees of the JW Trust at the time of filing of the petition in docket No. 2689–78.

The Peter A. B. Widener Trust was created in 1915 under the Will of Peter A. B. Widener. On March 29, 1971, under a decree of the Orphans Court Division of the Court of Common Pleas for the County of Montgomery, this trust was divided into four separate trusts, one of which (the PW Trust) is the petitioner in docket No. 2690–78. Ella Widener Wetherill (hereinafter Ella) was the sole income beneficiary of the PW Trust during the taxable year in issue. By its terms, the PW Trust will terminate on December 8, 1992, and its assets will be distributed to Ella, or to her issue if she is not then living. In the event of Ella's death prior to December 8, 1992, her children will succeed her as current income beneficiaries and remaindermen. Should Ella's children also die without issue prior to December 8, 1992, then P. A. B. Widener III, if living, or his issue, or in default thereof, the issue of P. A. B. Widener, will become current income beneficiaries and remaindermen.

Joseph E. Widener created the Joseph E. Widener Trust on April 20, 1938. On April 5, 1973, under a decree of the Orphans Court Division of the Court of Common Pleas for the County of Montgomery, this trust was divided into two separate trusts, one of which (the JW Trust) is the petitioner in docket No. 2689–78. Ella was the sole income beneficiary of the JW Trust during the taxable year in issue. By its terms, the JW Trust will terminate 21 years after the death of the last to die of Ella and P. A. B. Widener III. Upon Ella's death, her income interest in the JW Trust will pass to her children. Her children or their issue will receive the principal of the JW Trust upon its termination; in the event that no issue of Ella are then alive, the trust principal will pass to the issue of P. A. B. Widener II.

Ella has two children and P. A. B. Widener III has three, all born prior to 1975.

Because Ella was in a high tax bracket prior to and during the year in issue, she preferred to receive tax-exempt income from the trusts. The trusts were aware of her desire for tax-exempt income, and both trusts acceded to it by including some tax-exempt bonds in their investment portfolios. The trustees of the JW Trust, however, placed a greater emphasis on increasing corpus than did the trustees of the PW Trust, because the former felt a fiduciary obligation to the JW Trust's future beneficiaries. On June 30, 1975, the JW Trust held a higher percentage of tax-exempt securities than did the PW Trust, but we are satisfied that this was the result of a temporary adjustment.

The terms of petitioners' trusts did not require the trustees to follow Ella's instructions concerning trust investments.[1] Ella was not kept informed of the trusts' investments and was not consulted on any investment decisions. In particular, Ella was not consulted on the transactions in issue and was unaware of their occurrence.

On January 24, 1975, the trustees of the PW Trust and the JW Trust held a regularly scheduled meeting to discuss the portfolios of the two trusts. The relevant parts of the minutes of that meeting read as follows:

> The Trustees reviewed the capital gains position for the fiscal years ending January 31, 1975 for all three trusts. There were $285,640 of capital gains realized to date in the P.A.B. Widener * * * Trust and $124,143 gains realized to date in the Joseph E. Widener * * * Trust. In each of these accounts, stocks were held in which losses could be realized to offset these gains. After some discussion, the Trustees decided to sell certain stocks in

---

[1]The PW Trust was created by the Will of P. A. B. Widener. Item "Eighth" of that will provides:

Eighth: I give to my Executors in the settling up of my estate and to my Trustees after they have received my estate from the Executors, the following powers, all or any of which they may exercise in their discretion:

\* \* \* \* \* \* \*

3. Generally, to make investments and reinvestments, and to alter, vary and change investments and reinvestments, without being confined to those classes of securities which are named by law as proper investments for trustees.

The JW Trust was created by a deed of trust, sec. 2 of which provides:

"The Trustee named herein, and his successor and successors, shall have full discretion in the management of the trust, and neither he nor they nor any one of them shall be held liable or responsible for any loss to the trust provided they act in good faith."

each account in order to realize losses and minimize taxes. However, in order to preserve the consolidated position of the trusts in these holdings, which the Trustees consider to be of a good quality, it was decided that each trust would purchase the stocks being sold by the other. These transactions would all be handled in the securities markets.

\*     \*     \*     \*     \*     \*     \*

*Peter A. B. Widener * * * /E.W. Wetherill #65972*

*Sell*

6,000 shs. Allied Telephone Company

*Buy*

1,000 shs. A. T. Cross
2,000 shs. Sun Banks of Florida
2,000 shs. Lenox

*Joseph E. Widener * * * /E. W. Wetherill #56712*

*Sell*

1,000 shs. A. T. Cross
2,000 shs. Sun Banks of Florida
2,000 shs. Lennox

*Buy*

6,000 shs. Allied Telephone Company

On January 31, 1975, Provident Bank, as trustee (PW), sold 6,000 shares of Allied Telephone Co. owned by the PW Trust, and as trustee (JW) purchased those same shares for the account of the JW Trust. The price, net of commissions, was $65,157; that price was determined by choosing a price halfway between the most recent bid and asked prices for Allied Telephone Co. shares. The PW Trust's basis in these shares was $103,416.07, and the PW Trust claimed a loss of $38,259 on the transaction.

Also on January 31, 1975, Provident Bank, as trustee, sold shares owned by the JW Trust, and purchased those same shares for the account of the PW Trust, in the following amounts:

| Stock | Basis | Net sales price | Loss claimed by the JW Trust |
|---|---|---|---|
| 1. 1000 shares A.T. Cross Co. | $41,668.58 | $24,703 | $16,965.58 |

| | | | |
|---|---|---|---|
| 2. 2000 shares Sun Banks of Fla., Inc. | $49,375.00 | $18,964 | [2]$30,411.00 |
| 3. 2000 shares Lenox, Inc. | 48,811.34 | 29,943 | 18,868.34 |
| Total | 139,854.92 | 73,610 | 66,244.92 |

The prices at which these blocks of stock changed hands were determined by the quoted price of each particular stock over the exchange on which it was listed at the time of the sale, or, in the case of the Sun Banks of Florida, Inc., shares, by choosing a price halfway between the most recent bid and asked prices.

Provident effected all of the aforementioned stock sales by placing simultaneous buy and sell orders with Institutional Networks Corp. (hereinafter Instinet). Instinet is a computerized trading service that matches, without the mediation of a broker or established securities exchange, customers wishing to sell a particular stock with customers wishing to buy that stock. Instinet's computer matched Provident's buy and sell orders for each of the aforementioned stocks, and Instinet issued confirmation slips for each transaction.

All of the shares traded in the foregoing transactions were held in the name and possession of Provident Bank's nominee, Saxon & Co., both before and after the described transactions. Provident, as trustee of petitioner trusts, made appropriate entries on its internal books to record the change in ownership of the various shares. This procedure was a common practice of Provident to effect trades between two trusts of which it was trustee.

There is no evidence in the record to suggest that either trust had an explicit or an implicit right to reacquire any of the stock sold in the transactions in issue. We find that all sales in issue brought about complete and final changes in ownership of the shares involved.

## OPINION

Deductions in respect of losses from sales of property between the fiduciaries of two trusts that have the same grantor; between a fiduciary of a trust and a beneficiary of

---

[2]Mistakenly shown as $34,411 in the stipulation.

that trust; or between a fiduciary of a trust and a beneficiary of another trust, if the same person is a grantor of both trusts, shall not be allowed. Sec. 267(b)(5), (6), and (7).[3] Losses from transactions not within the scope of section 267 may still be disallowed in certain circumstances under section 1.267(a)–1(c), Income Tax Regs: [4]

(c) *Scope of section.* Section 267(a) requires that deductions for losses or unpaid expenses or interest described therein be disallowed even though the transaction in which such losses, expenses, or interest were incurred was a bona fide transaction. However, section 267 is not exclusive. No deduction for losses or unpaid expenses or interest arising in a transaction which is not bona fide will be allowed even though section 267 does not apply to the transaction.

The parties agree that section 267 does not require disallowance of the losses in issue;[5] they disagree as to whether these

---

[3]All statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue, unless otherwise stated.

[4]See also the legislative history of sec. 24, I.R.C. 1939, the forerunner of sec. 267:

*"Losses from sales or exchanges.*—Under existing law, section 24(a)6 of the Revenue Act of 1936, losses are specifically denied in the case of sales or exchange of property between members of a family or between a shareholder and a corporation in which such shareholder and his immediate family owns more than 50 per cent in value of the outstanding stock. This provision of existing law is not exclusive and the Government may still deny losses in the case of sales or exchanges not specifically covered thereby (for instance, between uncle and nephew) if such sales or exchanges are not bona fide. However, because the evidence necessary to establish the fact that a sale or exchange was not made in good faith is almost wholly within the knowledge of the person claiming the deduction, the Government has encountered considerable difficulty in sustaining the disallowance of the deduction in a great many cases. Moreover, the specific provisions of section 24(a)6 of existing law have proved inadequate to meet many situations of this type. Accordingly, your committee proposes the amendment of this section to provide certain additional restrictions on deductions of this character. However, as in the case of the provisions of existing law, it is not intended by this amendment to imply any legislative sanction of claiming deductions for losses on sales or exchanges in cases not covered thereby, where the transaction lacks the elements of good faith or finality, generally characterizing sales and exchanges of property. [1939–1 C.B. (Part 2), 722–723.]"

[5]While respondent concedes that sec. 267 does not apply to the facts of the present case, on brief, he attempts to reintroduce sec. 267 through the back door by arguing that the relationship between petitioner trusts is very close to falling within the spirit of sec. 267(b)(5).

Sec. 267 is a carefully drafted statute that imposes an irrebuttable presumption of a lack of bona fides on taxpayers claiming losses from certain carefully defined classes of transactions, and should be narrowly construed. *Snively v. Commissioner*, 20 T.C. 136, 149 (1953):

"We, therefore, conclude that the sale was made by a corporation to a valid trust under the laws of the State of Florida, and that since section 24(b)(1)(B) relates to sales between an individual and a corporation, the instant sale to a trust is not encompassed therein and the loss should have been allowed. That this result is the proper one to reach is buttressed by the

losses may be disallowed under section 1.267(a)–1(c), Income Tax Regs.

Petitioner points out that losses outside the scope of section 267 may be disallowed under section 1.267(a)–1(c), Income Tax Regs., only if not bona fide, and argues that since the sales between the trusts were at market prices and effected a permanent change in the legal ownership of the stocks sold, the losses in issue were bona fide.

Respondent contends that the losses in issue must be disallowed because they were not bona fide.

The transactions in issue were motivated solely by a desire to reduce current taxes; however, it is obvious that the vendee trusts each acquired the shares at reduced bases on which future gains or losses would be computed.

It is well settled that taxpayers are entitled to arrange their affairs to minimize their taxes (*Gregory v. Helvering*, 69 F.2d 809 (2d Cir. 1934), affd. 293 U.S. 465 (1935)), and we may not disallow the losses before us simply because petitioners were motivated by a desire to reduce their taxes. As we have noted, however (*Crown Cork International Corp. v. Commissioner*, 4 T.C. 19, 24 (1944)), where a transaction giving rise to a loss is motivated solely by tax avoidance, its good faith is suspect. We must therefore scrutinize the record before us with particular care to determine whether or not the transactions in issue were bona fide.

Neither section 1.267(a)–1(c), Income Tax Regs., nor the legislative history of the predecessor of section 267 defines "good faith" or "finality" or "bona fide." Respondent has cited us to cases which, while they do not define these phrases, do,

---

fact that, where Congress intended to disallow losses in transactions where a trust is a party, it did so expressly. In subparagraphs (D), (E), and (F) of section 24(b)(1), the Code disallows losses on a sale between a grantor and a fiduciary of any trust; or between the fiduciary of a trust and the fiduciary of another trust, if the same person is a grantor with respect to each trust; or between a fiduciary of a trust and a beneficiary of such trust. If Congress had intended that section 24(b) should apply to transactions between a trust and a corporation, we think it would have made specific provision therefor as it did in the various subparagraphs just referred to relating to other transactions by a trust."

See also Rev. Rul. 56–222, 56–1 C.B. 155; Rev. Rul. 71–50, 1971–1 C.B. 106; Rev. Rul. 77–439, 1977–2 C.B. 85, in which respondent admits he may not go beyond the explicit language of sec. 267 to disallow various claimed deductions.

according to respondent, indicate that the transactions here in issue lacked good faith and finality and were not bona fide.

*Fender v. United States*, 577 F.2d 934 (5th Cir. 1978), involved losses arising out of a sale coupled with an agreement that the seller would repurchase the assets sold, at the sales price, in 90 days. On these facts, the court held that there had been no bona fide sale.

*Transport Mfg. & Equipment Co. of Del. v. Commissioner*, T.C. Memo. 1968–190, affd. per curiam 431 F.2d 729 (8th Cir. 1970),[6] involved a loss arising out of a sale between two related parties at an artificially low price. We disallowed the loss on the ground that the transaction out of which it arose could not reasonably have been entered into by parties acting at arm's length.

The transactions between petitioners herein were final sales with no strings attached, and the prices involved were market prices. We find no support in the aforementioned two cases for respondent's contention that the sales in issue were not bona fide.

Respondent also cites us to several cases in which losses arising out of sales at market prices, with no strings attached, were disallowed. In *Higgins v. Smith*, 308 U.S. 473 (1940), the taxpayer sold stock at a loss to his wholly owned corporation, which was, the Court found, his corporate self.[7] The Supreme Court disallowed the loss, holding that because of the taxpayer's complete control of his corporation, the purported sale did not vary control or change the flow of economic benefits and had to be dismissed from consideration.

In *Crown Cork International Corp. v. Commissioner, supra,*[8] the taxpayer sold assets to its wholly owned subsidiary. We noted that not all transactions between parent and subsidiary corporations can be disregarded, but held that where the relationship between related corporations is such that they are in fact inseparable, any loss on sales between them must be disregarded since it does not represent a loss to the combined enterprise.

---

[6]See also *Skouras v. Commissioner*, T.C. Memo. 1962–33.

[7]Had present sec. 267 been in effect for the year in issue, this loss would have been disallowed by statute. Sec. 267(b)(2).

[8]See also *National Lead Co. v. Commissioner*, 40 T.C. 282 (1963).

In *Wickwire v. United States*, 116 F.2d 679 (6th Cir. 1941), the two taxpayers sold jointly owned stocks to their jointly owned corporation, and simultaneously purchased other stocks from their corporation. All transfers were at market price. The court found that the sales were not made in good faith, and disallowed the taxpayer's claimed loss deductions:

> The proof sustains the government's contention, stated in its brief, that the "appellants did not intend definitely to part with their legal and beneficial ownership of the stock during the taxable year but intended to and did retain effective control so that they might make up their minds at a later date when to sell or what to do with it." [116 F.2d at 681.]

In each of the three cases just discussed, a transaction was held to be lacking in good faith or finality because one party to the transaction controlled the other party, and so retained control of the assets sold even after the purported sale. Such is not the case in the transactions here in issue.

Petitioner trusts were formed 23 years apart, by different grantors. The trusts had a common trustee, but that trustee was mindful of its distinct fiduciary obligations to the two trusts. On this record, we are satisfied that neither trust controlled the other.

Respondent argues that Ella, as the income beneficiary of both trusts, controlled both trusts.[9] We agree that the fact that Ella was the income beneficiary of both trusts is material evidence on the question whether the transactions in issue varied control of the shares sold. It is not the only evidence, however.

The JW Trust investment policy emphasized growth of the corpus over the production of tax-exempt income, in deference to the interest of the future beneficiaries, in spite of the fact that Ella was the sole income beneficiary of the JW Trust during 1975; indeed, Pennsylvania law imposed upon the trustees of the JW Trust a fiduciary duty to the future beneficiaries of that trust. *In re Estate of Hamill*, 487 Pa. 592 (1980); *Thompson Estate*, 262 Pa. 278 (1918). This factor cuts against the conclusion that Ella controlled petitioner trusts.

---

[9]We note that Ella's interests in the principal of the two trusts are substantially different. She has no such interest in the trust which will terminate 21 years after the death of the survivor of herself and her brother, but the corpus of the other trust will go to her in 1992 if she is then living.

Ella's desire to receive tax-exempt income was respected by petitioners' trustees, at their discretion, but Ella had no voice in the specific investment decisions of either trust, and was unaware of the transactions here in issue. This also cuts against the conclusion that Ella controlled the trusts. On balance, we are persuaded that Ella, as sole income beneficiary of petitioners during the years in issue, did not control petitioners.

Respondent also argues that the transactions between the petitioners were not bona fide because they did not "change the flow of economic benefits" (*Higgins v. Smith, supra* at 476) from the stocks sold.

As we read *Higgins v. Smith, supra,* the assertion that the sale there in issue did not change the flow of economic benefits is simply a corollary of the Court's conclusion that the sale did not vary control of the assets sold.[10] On this reading, since we find that the sales before us did effect a change of control, we must conclude that those sales changed the flow of economic benefits from the stocks sold.

Our conclusion that the sales in issue changed the flow of economic benefits from the shares sold is further supported by the fact that the trusts had different contingent beneficiaries. This entails at least the possibility that future appreciation or depreciation of the shares traded by petitioners will be realized by beneficiaries other than those who would have realized such appreciation or depreciation had the sales in issue not occurred.[11]

Based on the foregoing considerations, and the entire record, we find that the sales in issue were bona fide; consequently, the deductions in respect of losses attributable to such sales will be allowed.

*Decisions will be entered for the petitioners.*

---

[10]This reading of *Higgins v. Smith*, 308 U.S. 473 (1940), is supported by our assertion in *Crown Cork International Corp. v. Commissioner*, 4 T.C. 19 (1944), that not all transactions between parent and subsidiary corporations can be disregarded, but only those where the two are in fact inseparable. This statement entails that a sale by a parent to a sufficiently independent subsidiary would change the flow of economic benefits even though the shareholders of the parent ultimately own both parent and subsidiary.

[11]We cannot dismiss as de minimis the interests of the contingent beneficiaries, for we have held that a contingent beneficiary is a beneficiary under the intendment of sec. 267.

---

*Hickman v. Commissioner,* T.C. Memo. 1972–208; cf. *Wyly v. Commissioner,* 662 F.2d 397 (5th Cir. 1981).