PECHINEY UGINE KUHLMANN CORP. AND SUBSIDIARY FORMERLY: PECHINEY ENTERPRISES, INCORPORATED AND SUBSIDIARIES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Pechiney Ugine Kuhlmann Corp. v. Commissioner
Docket No. 276-81.
United States Tax Court
T.C. Memo 1986-244; 1986 Tax Ct. Memo LEXIS 363; 51 T.C.M. (CCH) 1210; T.C.M. (RIA) 86244; June 17, 1986. *363 Petitioner (P) is a Delaware corporation which owned certain interest bearing convertible debentures of H, another Delaware corporation. P sold the debentures on June 18, 1970, at fair market value to I, a Netherlands Antilles corporation which was an indirectly wholly owned foreign subsidiary of one of P's two foreign corporate shareholders. P sustained a $5,078,691 capital loss which generated a $720,163 net operating loss carryback to P's 1969 tax year. Held, the capital loss sustained by P is allowable as a deduction under section 165, I.R.C. 1954. Stanley I. Rubenfeld and Alfred Ferrer III, for the petitioner. Marwin A. Batt and Arthur Yellin, for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: Respondent determined a deficiency of $169,981 in petitioner's Federal income tax for 1969 and issued a statutory notice of deficiency on October 9, 1980. At the same time respondent disallowed a $381,871 claim for refund petitioner had timely filed with respondent on November 26, 1974, for 1969. Petitioner subsequently filed a petition for redetermination of the deficiency and a determination that petitioner has made an overpayment of its Federal income *364 tax for 1969. Respondent has conceded error with respect to his deficiency determination. Consequently, the only matter before the Court is petitioner's claim for overpayment. [1] Resolution of this issue requires a determination as to whether a capital loss resulting from the sale by petitioner of interest bearing convertible debentures to an indirectly wholly owned foreign subsidiary of one of petitioner's two foreign shareholders is allowable pursuant to section 165. [2] Determination of this capital loss issue will resolve whether respondent's complete disallowance of a net operating loss carryback of $720,163 from petitioner's 1970 tax year to its 1969 tax year, which gave rise to the $381,871 refund claim, was proper. FINDINGS OF FACT Some of the facts have been stipulated and are so found and are incorporated herein by reference. Identity of Parties
Pechiney Ugine Kuhlmann *365 Corporation and Subsidiary (petitioner), formerly Pechiney Enterprises Incorporated and Subsidiaries (PEI), is a Delaware corporation, with its principal office at 825 Third Avenue, New York, New York. Petitioner's change of name occurred on June 1, 1972, but its principal office has remained the same since its inception on October 9, 1962. In 1969 and 1970, PEI was involved in a major reorganization, more fully described below. Pursuant to such reorganization, petitioner became the successor to PEI. Respondent confirmed this fact in a March 23, 1970, ruling which held that petitioner was the successor to PEI, with the consolidated return group of which PEI was the common parent continuing in existence with petitioner as its common parent. For convenience, we will refer to both petitioner and PEI as "petitioner." Petitioner's only shareholders were two French corporations, Pechiney Ugine Kuhlmann (Pechiney) and Societe d'Exploitations et d'Interests Chimiques et Metallurgiques (Seichime). Pechiney and Seichime were at all times relevant to this proceeding publicly owned French corporations, whose stocks were traded on the Paris Stock Exchange. Originally named Pechiney Compagnie *366 de Products Chimiques et Electrometallurgiques, Pechiney's name was later changed to Compagnie Pechiney. In 1971 Pechiney's name was again changed as a result of its merger with Ugine Kuhlmann, another publicly traded French corporation, to Pechiney Ugine Kuhlmann. Howmet Corporation (Howmet) has at all times relevant herein been a Delaware corporation. Howmet was originally incorporated in 1958 as Howe Sound Company. In 1965 its name was changed to Howmet. Howmet was a publicly traded corporation listed on the New York Stock Exchange, and its common stock and other securities were publicly traded until 1975. Interpan Curacao N.V. (Interpan) has at all times relevant herein been a Netherlands Antilles limited liability company. Interpan's activities have included a $17.5 million interim loan to Howmet on September 30, 1969; a $10 million 9-7/8 percent interim loan to Howmet on February 15, 1970; the purchase of $17.5 million of Howmet's 6-7/8 percent convertible subordinated notes (replacing the $10 million interim loan); and on January 4, 1971, the purchase of $15 million aggregate principal amount of 8-7/8 percent Howmet subordinated notes due January 4, 1986. From its formation, *367 Interpan was 100 percent owned by Internap, N.V., a Netherlands corporation, which was 100 percent owned by Simcpan S.A., a Panama corporation, which was 100 percent owned by Pechiney. Neither petitioner, Howmet, Seichime nor the public shareholders of Seichime have ever had any ownership interest in Interpan. At the time of the transaction challenged by respondent (June 18, 1970), petitioner was owned 60 percent by Pechiney and 40 percent by Seichime. Pechiney was owned 100 percent by the public. Seichime was owned approximately 70 percent by Pechiney and 30 percent by the public. Prior to November 9, 1969, Pechiney owned 85 percent of petitioner and Seichime owned 15 percent of petitioner. On February 8, 1970, the percentage ownership shifted to the 60-40 split referred to above. Also as part of the same transaction involving the shift in Pechiney's and Seichime's ownership of petitioner, Pechiney's ownership of Seichime increased from 51 percent to approximately 70 percent. As already noted, Howmet was originally incorporated in 1958. Petitioner first began to acquire shares in Howmet in 1962, [3] by way of a tender offer to the public shareholders of Howmet, then Howe Sound *368 Company. The tender offer resulted in petitioner obtaining 1,300,000 shares (approximately 40 percent) of Howmet common stock. Just prior to the transaction challenged by respondent, petitioner's ownership of Howmet common stock had risen to 46 percent. After the transaction petitioner's ownership in Howmet common stock had risen to approximately 56 percent. Between 1967 and 1975, Howmet had engaged primarily in the manufacture and fabrication of a variety of metal products, including aluminum, iron, steel, copper, brass and bronze products.Among its products were superalloys produced for turbine components of the jet engines of most commercial and military United States jet aircraft. Howmet engaged in a variety of Department of Defense contracts. Prior to the 1970 reorganization, Howmet also had a professional products division, *369 which manufactured and serviced a wide variety of equipment and tools for the medical and dental professions. During the years 1962 through 1975, Pechiney's operations and investments included the production of aluminum and a wide variety of other metals and chemicals. Aluminum production was pioneered by Pechiney, resulting in Pechiney being one of the world's foremost leader in aluminum production technology. As such, Pechiney has technological licensing and technical assistance agreements with many of the aluminum companies throughout the world, including the United States aluminum producers, Reynolds Metals and Kaiser Aluminum. In addition, Pechiney has engaged in joint ventures with American aluminum producers, such as an aluminum plant built and operated in Greece by Reynolds Metals and Pechiney. Change in Petitioner's Activities
From petitioner's inception in 1962 until 1964, petitioner was a holding company with its only assets being the common stock it acquired in Howmet and its only income the dividends declared on that stock. In 1964 petitioner entered into a number of agreements with American Metals Climax, Inc. (Amax) and Howmet to build and operate a plant and related *370 facilities for the production of primary aluminum to be located near Bellingham, Washington (Intalco project). Pursuant to the terms of the agreements, petitioner obtained a 25 percent interest in that plant and its aluminum output. Howmet also obtained a 25 percent interest and Amax a 50 percent interest, both with rights to corresponding percentages of the plant's output. In 1965 petitioner again entered into agreements with Amax and Howmet to construct and operate a second aluminum plant at the Intalco project site. The agreements provided for the same percentage interests in plant and output as was agreed upon for the first Intalco project. The second Intalco plant commenced operation in December, 1966. In 1966 petitioner, Amax and Howmet entered into agreements for the construction and operation of a third aluminum plant at the Intalco project site. Again, the same percentage interests in plant and output were agreed to by petitioner, Amax and Howmet. The third Intalco plant commenced operation in September, 1968. On August 16, 1967, petitioner acquired from Howmet pursuant to a subscription offer $11,625,700 principal amount of Howmet Corporation 4-1/2 percent convertible *371 subordinated debentures (the Howmet debentures). Petitioner's total cost for the Howmet debentures was $11,627,054. The additional $1,354 represented miscellanous costs. As part of the same subscription offer, an additional $13,549,900 principal amount of the debenture issue was sold to the public. The Howmet debentures were listed and traded on the New York Stock Exchange and were convertible into shares of Howmet common stock, which were also listed and traded on the New York Stock Exchange. As a result of the above described transactions, petitioner had evolved from a pure holding company in 1962 into principally an operating company, with sizable securities investments as well. Specifically, by June 30, 1968, dividends and interest received with respect to petitioner's holdings of Howmet stock and debentures accounted for only 27.8 percent of petitioner's gross profit, while 71 percent, which constituted the bulk of petitioner's gross profit, devolved from petitioner's interest in the three Intalco plants. The organization and management talent necessary to manage active operations differed substantially from those required of petitioner to manage an investment portfolio. *372 Consequently, petitioner and Howmet commenced a comprehensive study of their organizational structures in 1968. The organizational study was precipitated by several developments including petitioner's evolution from a holding company to an operating company, as already explained, and the dual ownership by both Howmet and petitioner of the same aluminum-producing operations, which resulted in a cumbersome overlap of management teams. In addition, the requirements for Howmet's medical division and its other businesses differed fundamentally from each other. The industry and markets in which the medical division competed were unrelated to the aluminum markets in which the majority of Howmet's products were sold. Another precipitating factor involved the changing financial condition of Howmet, which had declined. Its net income had dropped $1,139,000 from 1967 to 1968. A further decline was expected by Howmet management for 1969 earnings. Howmet's management's expectations materialized with an 18 percent drop in earnings from 1968 to 1969, when earnings dropped from $13,919,000 or $1.85 per share in 1968 to $11,447,000 or $1.51 per share in 1969. Of final significance was the belief *373 by both management teams of petitioner and Howmet that additional supplies of aluminum were needed. The excess demand was generated by Howmet's aluminum fabricating needs and petitioner's aluminum sales as forecasted by both companies. To meet the increased demand, plans were developed for a new aluminum facility to be constructed in Maryland at an approximate cost of $100 million. This figure made additional financing imperative. Confronted with the set of circumstances as previously described, petitioner consulted with its investment advisers, the investment banking firms of Lazard Freres & Co. and Morgan Stanely & Co., Inc., and its legal advisers, the law firm of Shearman & Sterling. Howmet, likewise, consulted with its investment advisers, the investment banking firm of White, Weld & Co. (later acquired by Merrill Lynch) and its legal advisers, the law firm of Seward & Kissel. When petitioner's investment advisers had arrived at a course of action to be taken to address the altered circumstances of petitioner, notification was given to the Metropolitan Life Insurance Company (Metropolitan). A 1963 loan agreement between petitioner and Metropolitan required petitioner to *374 seek Metropolitan's consent prior to taking certain corporate actions. The Metropolitan Loan
On May 29, 1963, petitioner had borrowed $17.5 million from Metropolitan on a long-term, 20-year basis, at 5-5/8 percent interest. The principal and interest were unconditionally guaranteed by Pechiney. In addition, petitioner was required to pledge to Metropolitan all Howmet common stock presently owned by petitioner and any additional Howmet common shares acquired by petitioner in the future, up to 51 percent of the total Howmet shares outstanding. Since petitioner had acquired 1,300,000 shares (approximately 40 percent) in 1962 for $20 million, all subsequent acquisitions up to 11 percent of additional Howmet common stock would have to be pledged to Metropolitan. Petitioner was also prohibited from obtaining additional debt over $7.5 million which limit was raised to $10 million on October 26, 1967. Petitioner's dividend payments were also restricted. The proceeds of the loan were to be used to retire debt which was incurred during the acquisition of the Howmet stock and existing subordinated indebtedness. Finally, petitioner was prohibited from entering into a sale, lease, merger, or *375 consolidation unless certain requirements guaranteeing Metropolitan's security were complied with and there were no violations of the notes and related agreements. The net effect of the restrictions imposed upon petitioner by the notes and related agreements was to impose a duty upon petitioner to obtain Metropolitan's approval prior to taking certain corporate actions. Petitioner did in fact on several occasions request and obtain the consent of Metropolitan before incurring more debt. By September 30, 1968, petitioner had advised Metropolitan that petitioner had undertaken a comprehensive study of its organizational structure that would require Metropolitan's consent pursuant to the 1963 loan agreements. Metropolitan was also advised at that time by petitioner that a contemplated reorganization presently included a major financing effort by petitioner and by Howmet to raise approximately $100 million to construct a new aluminum production plant in Maryland. On September 8, 1969, petitioner submitted a memorandum prepared jointly by the advisers of both petitioner and Howmet, Lazard Freres & Co. and White, Weld & Co., describing a proposed reorganization plan. 1969 Proposed Reorganization *376 The reorganization, as originally contemplated, comprised four major aspects: (1) combining in one company the aluminum assets of petitioner with those of Howmet; (2) investment by petitioner's shareholders, Pechiney and Seichime, of an additional $32.5 million to help pay for the proposed new $100 million aluminum plant to be built in Maryland; (3) spin-off by Howmet of its professional products division to a separate company, which would be publicly traded; and (4) the sale by petitioner of the Howmet debentures to Interpan, the use of the proceeds to reduce outstanding loans to petitioner from its shareholders, and the contribution to petitioner's capital account of the remaining shareholder loans to petitioner. In addition to the memorandum to Metropolitan describing the contemplated reorganization, a detailed description was included in Howmet's 1969 proxy materials. The proposed merger required many consents from various parties before it could be effectuated. As noted earlier, one of these consents was that of Metropolitan. Petitioner's long-term loan from Metropolitan was at a significantly lower interest rate than petitioner could currently get elsewhere in 1969. Specifically, *377 the Metropolitan loan was at 5-5/8 percent interest, while short-term business loans of over $1 million were being offered primarily between 8-1/2 percent and 9 percent in August of 1969. The prime rate at that time was 8-1/2 percent. Long-term rates, which would naturally be higher, were not recorded in the Federal Reserve Bulletin at that time. The proposed plan of reorganization envisioned a transfer by merger of petitioner's profitable aluminum business to Howmet in exchange for additional stock in Howmet. Howmet's professional products group would be incorporated into a separate company (Howmedica) and concurrently with the consummation of the merger Howmet would distribute 80 percent of the stock of Howmedica to Howmet's shareholders. Petitioner would receive 1,126,666 shares of Howmedica common stock, representing approximately 36 percent of the Howmedica common stock to be outstanding immediately after the distribution. Petitioner would agree to sell at a price of $3,750,000 10 percent of the shares of Howmedica common stock to be outstanding at the time of the distribution (thereby reducing its ownership of Howmedica to approximately 26 percent) to a limited partnership *378 of which the expected principal executive officers of Howmedica would be the sole general partners. As a result of the proposed transactions, petitioner would become a holding company. Petitioner's main source of income after the reorganization would be dividends from its Howmet stock and income from miscellaneous nonoperational transactions. Petitioner would lose the operating assets which had contributed 71 percent of its gross profits in 1969, but would be left with a considerable amount of debt on its balance sheet. Specifically, on December 31, 1968, petitioner had $36.3 million in long-term debt, consisting of $15.4 million owed to Metropolitan pursuant to the 1963 loan, $5,148,000 owed to Pechiney and $15,784,000 owed in long-term notes to Seichime or another subsidiary. Thus, in order to obtain the consent of Metropolitan and thereby permit petitioner to retain a very favorable long-term loan with a low rate of interest, petitioner represented to Metropolitan that it would reorder its balance sheet. Accordingly, as part of the plan of reorganization, petitioner proposed to (1) sell the Howmet debentures held by petitioner and use the proceeds to reduce petitioner's debts *379 to its parent companies; and (2) apply to the French Ministry of Finance for authorization to convert the balance of the loans from Pechiney and Seichime into equity. With respect to the sale of the Howmet debentures, petitioner represented that they would be sold, following the merger, to a company which is wholly owned by a wholly owned subsidiary of Compagnie Pechiney (Pechiney). Petitioner represented to the French government that petitioner's financial structure had to be revised in order to make the company viable in light of the size of its debt obligations and future sources of income. The materials presented to Metropolitan and the French government to obtain their consent to the reorganization described both the sale of the Howmet debentures and the conversion of parent company loans into equity as an integral part of the reorganization. Petitioner obtained consents from both Metropolitan and the French government. In addition to the consents required by Metropolitan and the French government, the proposed 1969 reorganization required the following consents: (1) the board of directors of both petitioner and Howmet; (2) the shareholders of Howmet; (3) the Securities and Exchange *380 Commission's approval of the proxy materials to be sent to the Howmet shareholders in connection with that shareholder vote; (4) the Securities and Exchange Commission with respect to a private ruling that the retention of certain Howmedica stock qualified for exemption pursuant to the Investment Company Act of 1940; (5) consents by the commercial banks that had loaned money to petitioner on a short-term basis; (6) the consent of Amax, owner of 50 percent of the Intalco projects; and (7) private tax rulings by both the Corporate Reorganization Division and the Corporation Tax Division of the Internal Revenue Service. All such consents to the proposed 1969 plan of reorganization were obtained except for the required tax rulings. Petitioner and Howmet were notified of the failure to obtain favorable tax rulings on or about December 24, 1969. Subsequently, petitioner, Howmet, and their investment banking and legal advisers reconvened and restructed the reorganization to meet the objections of the Internal Revenue Service. 1970 Reorganization
The revised 1970 plan of reorganization accomplished the same goals as the proposed 1969 plan. However, the surviving entity in the merger of *381 aluminum assets of both petitioner and Howmet was to be a different entity than that planned in the 1969 plan. The four major aspects of the 1969 plan were also a major part of the 1970 plan, to wit: (1) combining in one company the aluminum assets of petitioner with those of Howmet; (2) investment by petitioner's shareholders, Pechiney and Seichime, of an additional $32.5 million to help pay for the proposed new $100 million aluminum plant to be built in Maryland; (3) spin-off by Howmet of its professional products division to a separate company, which would be publicly traded; and (4) the sale by petitioner of the Howmet debentures to Interpan, the use of the proceeds to reduce outstanding loans to petitioner from its shareholders, and the contribution to petitioner's capital account of the remaining shareholder loans to petitioner. On February 9 and 17, 1970, new ruling requests were submitted to the Internal Revenue Service outlining the revised plan of reorganization. The revised ruling requests specifically disclosed that petitioner might sell the Howmet debentures to Interpan or another affiliate of Pechiney but did not request rulings concerning such a transaction, and none *382 were given. As with the proposed 1969 plan, the revised 1970 plan of reorganization required the approvals and consents of Metropolitan, the French government, the board of directors of both petitioner and Howmet, the shareholders of Howmet, the Securities and Exchange Commission regarding approval of proxy materials and exemption qualification from the Investment Company Act of 1940 for the retention of certain Howmedica stock, the commercial banks that had loaned petitioner money on a short-term basis, Amax, and the Corporate Reorganization Division and the Corporation Tax Division of the Internal Revenue Service through favorable private tax rulings. The revised 1970 plan of reorganization was described to all those whose consents were required, and all necessary consents were obtained. The requested private tax rulings from the Internal Revenue Service were issued on February 24, 1970, and March 23, 1970. The 1970 reorganization plan was then executed with the final action occurring on June 18, 1970, when petitioner sold the Howmet debentures to Interpan. Howmet Debenture Sale
Petitioner sold $11,625,700 face amount of Howmet 4-1/2 percent convertible subordinated debentures *383 to Interpan for $6,548,363. The sale price was at the fair market value of these debentures based upon the market prices on which Howmet debentures publicly traded on the New York Stock Exchange on or about June 18, 1970. The Howmet debentures had been acquired by petitioner in August 1967 at a cost of $11,627,054. Petitioner claimed a capital loss of $5,078,691 on the sale. On June 18, 1970, petitioner was owned 60 percent by Pechiney and 40 percent by Seichime. On that date Seichime was approximately 30 percent owned by the public. The entire proceeds of petitioner's sale of the debentures to Interpan, $6,548,363, were used to reduce petitioner's then outstanding long-term debt as had been contemplated. This was accomplished by Interpan's assumption of a portion of petitioner's debt owed to Seichime. No other asset was transferred between petitioner and Interpan. Also as contemplated, the balance of petitioner's long-term indebtedness to its parent companies (approximately $14 million) was converted into equity. Petitioner's sale of the Howmet debentures to Interpan resulted in petitioner's realizing a greater sale price than would have been realized by selling the debentures *384 to the public or in a private placement. It would have been difficult for petitioner to have sold the Howmet debentures in a public offering because of the quality of the conversion price of the debentures. If an underwriting group could have been formed to market the Howmet debentures, for which considerable doubt existed, petitioner would have realized between $966,363 to $1,193,363 less than it realized from selling the Howmet debentures to Interpan. Likewise, if petitioner had sold the Howmet debentures in a private placement, petitioner would have realized a minimum of $1,084,363 less than it realized from selling the Howmet debentures to Interpan. In both instances the lesser amount realized would have been caused by the necessity of selling the Howmet debentures to the public or private group at a lower price than that quoted on the New York Stock Exchange because of the size of the offering and the quality of the conversion price. Moreover, related underwriting fees or investment banking fees and substantial expenses related to registration of the offering with the Securities and Exchange Commission would have reduced the amount petitioner realized. More than five years *385 later, on September 23, 1975, petitioner's shareholders, Pechiney and Seichime, contributed the Howmet debentures to the capital of petitioner.The contribution by petitioner's shareholders of the Howmet debentures to petitioner's capital in 1975 was in connection with petitioner's decision in 1975 to acquire 100 percent of the outstanding publicly traded common stock of Howmet and all of Howmet's outstanding publicly traded 4-1/2 percent convertible subordinated debentures. As disclosed in petitioner's filing with the Securities and Exchange Commission, the purpose of that decision by petitioner was to increase its operating flexibility in managing the operations of Howmet. Pechiney and Seichime had obtained control over the Howmet debentures on the same day they contributed them to petitioner. Pechiney bought 60 percent of the Howmet debentures from Interpan with a par value of $6,975,420 for a price of $4,394,514.60. Payment was accomplished by cancellation of Interpan's debt to Pechiney in the amount of $3,540,000 and transferring the balance of $859,514.60 to Interpan's account. Seichime bought the remaining 40 percent of the Howmet debentures with a par value of $4,650,280 *386 for a price of $2,929,676.40. Payment was accomplished by cancellation of Interpan's debt in the amount of $2,360,000 and transferring the balance of $569,676.40 to Interpan's account. Interpan had assigned the Howmet debentures to Internap On March 7, 1973, but had bought them back on September 23, 1975, for $7,324,191. At the time of that contribution, the Howmet debentures were different in several material respects from their character at the time they were sold to Interpan in 1970. Specifically, they were no longer convertible into shares of Howmet common stock, they were delisted from the New York Stock Exchange on September 2, 1975, and there was no longer an active market for them. The value of the Howmet debentures had increased from their 1970 value of $56 per $100 face amount to $63 per $100 face amount. On June 12, 1970, petitioner realized a capital gain on the sale to the public of a portion of its stock in Howmedica. The capital gain realized amounted to $817,032. Petitioner offset that gain with $817,032 of the $5,078,691 capital loss it reported on its June 18, 1970, sale of the Howmet debentures to Interpan. Of the $5,078,691 capital loss claimed by petitioner *387 on its 1970 sale of the Howmet debentures, only $1,200,424 was usable by petitioner to offset capital gains in the loss year or the period during which the loss could be carried forward or back. At all times relevant to this proceeding, petitioner and Interpan were separate and distinct corporate entities. OPINION Petitioner is a Delaware corporation which is wholly owned by two French corporations, Pechiney and Seichime. Petitioner was organized in 1962 by its shareholders to acquire a 40 percent interest in Howe Sound Company (Howmet), a publicly traded Delaware corporation. In addition to petitioner's equity interest in Howmet, petitioner acquired on August 16, 1967, $11,625,700 principal amount of Howmet 4-1/2 percent convertible subordinated debentures. As part of a major reorganization, petitioner sold the Howmet debentures on June 18, 1970, at fair market value to Interpan, a Netherlands Antilles corporation, which was an indirectly wholly owned foreign subsidiary of Pechiney. Petitioner sustained a $5,078,691 capital loss which generated a $720,163 net operating loss carryback to petitioner's 1969 tax year. Respondent has challenged the sale of the Howmet debentures and *388 has determined that the loss is not allowable under section 165. Respondent supports his position with three arguments: (1) the loss is not allowable because, although the sale was at fair market value, the sale was not for a valid business purpose; (2) the loss is not allowable because the sale did not change control of the debentures or vary the flow of economic benefits; and (3) petitioner's receipt of the Howmet debentures as a capital contribution from its shareholders more than five years after the 1970 sale caused the sale to lack economic reality and was thus a sham. Conversely, petitioner asserts that the sale was made for valid business reasons and at fair market value, and the loss is therefore allowable pursuant to section 165. Moreover, petitioner contends that the control and economic flow of the Howmet debentures did change as a result of the sale. Petitioner's response to respondent's tax sham argument is that there was never a preconceived plan to reacquire the Howmet debentures. Respondent's determination is, of course, presumed correct, and the burden is on petitioner to prove that respondent has erred. Rule 142(a). For the reasons that follow we agree with *389 petitioner, and we so hold, that the loss sustained by petitioner is allowable as a deduction under section 165. Section 165(a) provides the general rule that "[t]here shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise." Only bona fide losses are allowable. Section 1.165-1(b), Income Tax Regs. Thus, absent a statutory provision to the contrary, such as section 267, [4] a loss sustained on a sale between related parties at fair market value and for a valid business purpose, independent of tax avoidance, is allowable as a deduction under section 165. See Apex Corp. v. Commissioner,42 T.C. 1122 (1964) (loss deductible on corporate taxpayer's sale at fair market value of equipment to related corporation because sale motivated by business purpose).[5] *390 Respondent agrees that the Howmet debentures were sold at fair market value. Consequently, he relies on his theory that no valid business purpose existed for the sale to disallow the loss under section 165. Respondent's theory is not supported by the facts as we have found them. As noted in our findings, the sale of the Howmet debentures was a major aspect of the plan of reorganization. Respondent does not argue that the reorganization lacked business purpose, but rather confines his lack of business purpose to the sale of Howmet debentures. The sale of the Howmet debentures, however, was intended to aid petitioner in obtaining the consent of Metropolitan for the plan of reorganization and was therefore an integral part of the reorganization itself. It is unnecessary to restate here the valid business objectives accomplished *391 by the reorganization except to emphasize the condition of petitioner after the reorganization. Specifically, petitioner would give up 71 percent of its gross profit for additional stock in Howmet. In other words, petitioner would again become a holding company, dependent upon passive earnings to service its debt. Given the large amount of debt outstanding, it was imperative to restructure petitioner's balance sheet not only to remain as a viable entity but also to satisfy Metropolitan that repayment on its note was assured. Petitioner's desire to retain the favorable interest rate it enjoyed on the Metropolitan loan is certainly a legitimate business reason for structuring the reorganization in a way which would assure Metropolitan's consent. Furthermore, the mechanism utilized by petitioner, i.e., the sale of the Howmet debentures to Interpan and the conversion of petitioner's remaining debt to its parent companies into equity, was under the circumstances a valid means of debt restructuring. Prior to the reorganization, the assets listed on petitioner's balance sheet consisted primarily of its operating interests in the Intalco projects and its stock and debentures of Howmet. *392 After the reorganization, the only available assets which could be utilized to reduce its debt were the Howmet debentures. We are thus satisfied that the sale of the Howmet debentures was supported by a legitimate business purpose. Respondent relies on Higgins v. Smith,308 U.S. 473 (1940); Crown Cork International Corporation v. Commissioner,4 T.C. 19 (1944), affd. per curiam 149 F.2d 968 (3d Cir. 1945); and Transport Mfg. & Equipment Co. of Del. v. Commissioner,T.C. Memo. 1968-190, affd. per curiam 431 F.2d 729 (8th Cir. 1970), to support his position that petitioner's loss should be disallowed. In all three cases, respondent has ignored the lynchpin of those decisions, to wit: that the transfers at issue were made without a business purpose and instead were made solely to reduce tax liability. Moreover, in Crown Cork and Transport, the losses claimed resulted from transfers of property at artificial prices. Consequently, respondent's authority is inapposite to the situation under consideration in this case. Of final significance with respect to the valid business purpose supporting the sale of the Howmet debentures is the fact that they were sold to Interpan. Again, we find *393 nothing in the sale to Interpan, even though a related party, which would taint the bona fides of the sale. As already noted, the sale was at fair market value. Moreover, as indicated in our findings, there were substantial cost savings obtained by petitioner by selling to Interpan rather than on the open market or in a private placement. The amount saved in terms of private placement fees, the registration costs avoided and the adverse impact on the amount of the proceeds an offering of this magnitude would have created, lends substance to the course of action chosen by petitioner. Commissioner v. W.F. Trimble & Sons Co.,98 F.2d 853 (3d Cir. 1938). In addition to there being a valid business purpose for the sale of the Howmet debentures, the record is equally as clear that the sale changed control of the debentures and varied the flow of economic benefits. The most obvious evidence of this fact is that prior to the sale, Seichime, which is 30 percent owned by the public, had an indirect 40 percent interest in the Howmet debentures held by petitioner. After the sale, Seichime's public shareholders no longer had any interest in the Howmet debentures. In Widener Trust No. 5 v. Commissioner,80 T.C. 304 (1983), *394 we stated that: [N]ot all transactions between parent and subsidiary corporations can be disregarded, but only those where the two are in fact inseparable. This statement entails that a sale by a parent to a sufficiently independent subsidiary would change the flow of economic benefits even though the shareholders of the parent ultimately own both parent and subsidiary. [80 T.C. at 313 n.10.] Respondent has stipulated that petitioner and Interpan were two completely separate and distinct entities, and the record establishes a clear severance of control over the Howmet debentures. After the sale, petitioner, a separate and distinct entity from Interpan, had given up control of as well as petitioner's rights to interest and future appreciation of the Howmet debentures. Thus, the sale changed control of the debentures and varied the flow of economic benefits. Respondent's final argument is that petitioner's sale of the Howmet debentures lacked economic substance and as such constituted a sham. Respondent contends that petitioner participated in a prearranged plan by which it was to reacquire the Howmet debentures. Respondent's contention is unsupported by the facts. The record fails *395 to reveal any express agreement or understanding among the parties involved that such a reacquisition would occur or any facts from which an unwritten agreement or understanding could fairly be inferred. Admittedly, petitioner did eventually regain control of the debentures, but not until more than five years had elapsed. However, Philippe Chaminade, petitioner's Vice President-Treasurer during the relevant years, testified that the reacquisition of the Howmet debentures took place as part of petitioner's program to increase its percentage ownership of Howmet, commenced through a tender offer in 1973, to 70 percent and ultimately to at least 90 percent. In 1975 petitioner decided to acquire 100 percent of the outstanding publicly trade common stock of Howmet and all of Howmet's outstanding debentures. Petitioner's objective was to increase petitioner's flexibility in managing the operations of Howmet. Furthermore, the character of the debentures had changed by the time they were contributed to petitioner as additional capital by Pechiney and Seichime. Specifically, the debentures were no longer convertible into Howmet stock and they were delisted from the New York Stock Exchange. *396 In addition, the debentures had risen in value from $56 per $100 face value to $63 per $100 face value. These facts are clearly beyond the application of a sham transaction theory. Cf. Falsetti v. Commissioner,85 T.C. 332 (1985). To reflect prior concessions and the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Jurisdiction over petitioner's claim for overpayment of income tax is conferred on this Court by section 6512(b), I.R.C. 1954↩. 2. All section references are to sections of the Internal Revenue Code of 1954 in effect for the year in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. We note a conflict in the stipulation of facts where the parties have stipulated petitioner's first acquisition to have occurred in 1962 and in 1963. We have accepted the 1962 date as the correct date as evidenced by the tender offer made by petitioner to the public shareholders dated October 15, 1962, and the closing memorandum dated November 8, 1962.↩
4. Respondent has not asserted that section 267 is applicable in this case. ↩
5. See also Widener Trust No. 5 v. Commissioner,80 T.C. 304 (1983); Anderson, Clayton & Co. v. Commissioner, a Memorandum Opinion of this Court dated August 18, 1948, 7 T.C.M. 573, 574, 17 P-H Memo T.C. par. 48, 162 (loss incurred on sale at market value of assets by one subsidiary to another held deductible as sale motivated by "real business purpose"); Brost Motors v. Commissioner, a Memorandum Opinion of this Court dated October 29, 1948, 7 T.C.M. 806, 17 P-H Memo T.C. par. 48, 226; Electric Auto-Lite Co. v. Commissioner, a Memorandum Opinion of this Court dated August 4, 1943, 2 T.C.M. 560, 12 P-H Memo T.C. par. 43, 371; Rev. Rul. 76-88, 1976-1 C.B. 52↩.